FILED

FEB - 7 2024

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY:                    Deputy Clerk

1  Dennis Ayre
   17641 Gilmore St
2  Van Nuys, CA, 91406
   Phone: (310) 749-2049
3

4
   DENNIS AYRE, IN PRO PER
5
                **UNITED STATES BANKRUPTCY COURT**
6
                **CENTRAL DISTRICT OF CALIFORNIA**
7
                **SAN FERNANDO VALLEY DIVISION**
8

9

10  NAME OF PLAINTIFF(S)                )    Case No.: 1:2023ap01037

11        SUSAN SHAPIRO COWAN)

12     vs.                             )    **OBJECTION TO MOTION FOR**
                                            **SUMMARY JUDGEMENT**
13  NAME OF DEFENDANT(S),              )

14                                     )
         DENNIS PHILLIP AYRE           )
15                                     )

16                                     )

17                                     )

18                                     )

19                                     )

20

21  _____

22

23  DATED FEBRUARY 6, 2024

24

25                                              *Dennis Ayre*

26                                         _____

27                                              Dennis Ayre

28                                              In Pro Per

                          - 1 -
        **OBJECTION TO MOTION FOR SUMMARY JUDGEMENT**

1  **TO THE HONORABLE VICTORIA KAUFMAN, UNITED STATES BANKRUPTCY**

2  **JUDGE; THE OFFICE OF THE UNITED STATES TRUSTEE; PLANTIFF AND HER**

3  **COUNSEL OF RECORD; AND ALL OTHER INTERESTED PARTIES:**

4

5  **OBJECTION TO MOTION FOR SUMMARY JUDGEMENT**

6

7  **NOTICE IS HEREBY GIVEN** that, in accordance with Federal Rule of Bankruptcy

8  Procedure (FRBP) 56, Local Bankruptcy Rule (LBR) 7056, and Federal Rule of Civil Procedure

9  (FRCP) 56, the undersigned, Dennis Phillip Ayre ("Debtor" or "Defendant"), objects to the Motion

10  for Summary Judgment filed by Susan Shapiro Cowan ("Plaintiff" or "Cowan") in the above-

11  referenced adversary proceeding. The Defendant respectfully submits this objection and requests

12  that the Court deny the Plaintiff's Motion for Summary Judgment for the reasons set forth herein.

13  Contrary to the assertions made in the Motion, the Defendant submits that there are

14  substantial disputes concerning material facts that preclude the granting of summary judgment in

15  this matter. To this end, the Defendant is concurrently filing a Statement of Controverted Facts,

16  which identifies and elaborates on the significant factual disputes that must be resolved through

17  further proceedings.

18  This objection and the accompanying Statement of Controverted Facts by the Defendant are

19  based upon this Notice of Objection, referenced Cases and Authorities, attached Exhibits, all

20  pleadings, documents, and records on file with this Court, and any oral arguments that may be

21  deemed necessary at the time of the hearing.

22

23

24

25

26

27

28

**OBJECTION TO MOTION FOR SUMMARY JUDGEMENT**

1

## TABLE OF AUTHORITIES

2   **CASES**       **Pages**

3   Agosto v. INS, 436 U.S. 748, 756, 98 S.Ct. 2081, 56 L.Ed.2d 677 (1978)     12

4   Allen v. McCurry, 449 U.S. 90, 95 (1980)     6

5   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)     12

6   Basic Inc. v. Levinson, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)     18

7   In re Behrends, 660 F. App'x 696 (10th Cir. 2016)     10

8   Berson v. Applied Signal Technology, Inc., 527 F.3d 982 (9th Cir. 2008)     18

9   County of Tuolumne v. Sonora Cmty. Hosp., 236 F.3d 1148, 1154 (9th Cir. 2001)     12

10   Crocog Co. v. Reeves, 992 F.2d 267, 269 (10th Cir. 1993)     6

11   In re Fusco, 641 B.R. 438 (Bankr. E.D.N.Y. 2022)     10

12   Grogan v. Garner, 498 U.S. 279, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991)     10

13   In re Crespin, 551 B.R. 886 (Bankr. D.N.M. 2016)     6

14   In re Shari Siebel, 2018 WL 2283835, at *4     6

15   In Williams v. Williams (In re Williams' Estate), 36 Cal.2d 289, 223 P.2d 248 (1950)     7

16   Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 131 S.Ct. 1309, 179 L.Ed.2d 398 (2011)     18

17   North Slope Borough v. Rogstad (In re Rogstad), 126 F.3d 1224, 1227 (9th Cir. 1997)     11

18   People v. Sims, 32 Cal.3d 468, 186 Cal.Rptr. 77, 651 P.2d 321 (1982)     7

19

20   **STATUTES**

21   11 U.S.C. § 523(a)(2)(A)

22   11 U.S.C. § 523(a)(4)

23   11 U.S.C. § 523(a)(6)

24   11 U.S.C. § 523(a)(19)

25   28 U.S.C. § 1738

26

27

28

**OBJECTION TO MOTION FOR SUMMARY JUDGEMENT**

1  **RULES**

2  Federal Rule of Civil Procedure 56

3  Federal Rule of Bankruptcy Procedure 7056

4  SEC Rule 10b-5

5

6  **OTHER AUTHORITIES**

7  4 Collier on Bankruptcy ¶ 523.27

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**OBJECTION TO MOTION FOR SUMMARY JUDGEMENT**

# I.INTRODUCTION

The crux of Plaintiff's motion rests on an erroneous interpretation and application of the law concerning the non-dischargeability of certain debts under 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), 523(a)(6), and 523(a)(19). Specifically, Plaintiff contends that the default judgment arising from a FINRA Award, absent actual litigation of allegations of fraud, should be afforded preclusive effect to establish non-dischargeability in this adversarial bankruptcy proceeding. This argument not only misinterprets the nuanced thresholds set forth by cited statutes but also misrepresents the factual record and the legal standards governing issue preclusion and the dischargeability of debts in bankruptcy.

The Defendant's objection highlights the following critical points:

1. Relevant case law and statutory provisions, including but not limited to the full faith and credit statute and Supreme Court precedents, clarify the limited circumstances under which preclusion may apply to default judgments in the context of bankruptcy dischargeability issues.

2. The Plaintiff erroneously equates the preclusive effect of a default judgment with one where allegations of fraud were fully litigated, thereby expanding the scope of preclusion beyond its legally established boundaries.

3. A detailed analysis of the proceedings and outcomes of related arbitration awards demonstrates that the essential issues purported by the Plaintiff to support non-dischargeability were neither "actually litigated" nor resolved in a manner that would meet the legal standards for preclusion or non-dischargeability.

4. The impact of preclusive effect notwithstanding, there are significant disputed facts included in a Statement of Controverted Facts.

**OBJECTION TO MOTION FOR SUMMARY JUDGEMENT**

5.      The Plaintiff has failed to provide adequate evidence to satisfy the stringent requirements for non-dischargeability under 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), 523(a)(6), and 523(a)(19) of the Bankruptcy Code.

Therefore, the Defendant asserts that the motion for summary judgment is premised on a flawed legal basis and a mischaracterization of the factual record. It is incumbent upon this Court to deny the Plaintiff's motion, as genuine disputes of material fact remain unresolved and the legal standards for non-dischargeability and summary judgment have not been met. The following objection outlines the Defendant's arguments in detail and underscores the necessity of adjudicating these disputes through a full and fair trial.

## II. MISCHARACTERIZING PRECLUSIVE EFFECT

The core argument of the Plaintiff's motion for summary judgment rests on the assertion that a default judgment should be accorded the same legal significance as a judgment where allegations of fraud have been fully adjudicated. This argument erroneously expands the application of preclusion principles beyond their intended scope, claiming that a debt stemming from a default judgment is non-dischargeable. The principle of full faith and credit, codified in 28 U.S.C. § 1738, underpins the practice of federal courts giving state court judgments the same preclusive effect they would enjoy in the state courts where they were issued. This principle is well-established in jurisprudence, including in landmark cases such as *Allen v. McCurry, 449 U.S. 90, 95 (1980)*, which acknowledges the consistent practice of federal courts in applying preclusive effects to state court decisions, and *Crocog Co. v. Reeves, 992 F.2d 267, 269 (10th Cir. 1993)*, which reiterates the mandate for federal courts to respect state court judgments in accordance with 28 U.S.C. § 1738.

Further case law, including *In re Crespin, 551 B.R.* and *In re Shari Siebel, 2018 WL 2283835, at *4,* confirms the potential for state court judgments to influence subsequent bankruptcy cases. However, a crucial distinction is made regarding the bankruptcy court's unique authority to determine the dischargeability of debts. This distinction is highlighted by the Supreme Court's emphasis on the exclusive jurisdiction of bankruptcy courts in matters of debt dischargeability, as seen in *Crespin, 551 B.R. at 896–97*, referencing *Brown, 442 U.S. at 135-36*. The Court has

- 6 -
**OBJECTION TO MOTION FOR SUMMARY JUDGEMENT**

1  explicitly stated that applying the doctrine of res judicata (claim preclusion) in decisions regarding

2  dischargeability could undermine this exclusive jurisdiction, signaling a significant limitation on the

3  blanket application of preclusive effects from default judgments to bankruptcy dischargeability

4  determinations.

5     California's legal framework acknowledges the preclusive effect of default judgments, yet it

6  thoughtfully imposes critical limitations to safeguard against the undue extension of such

7  preclusion, especially in contexts where issues were not subjected to actual litigation. This nuanced

8  approach is vividly illustrated in the seminal case of In Williams v. Williams (In re Williams'

9  Estate), 36 Cal.2d 289, 223 P.2d 248 (1950), which remains a cornerstone for understanding the

10 application and boundaries of issue preclusion in California.

11    The Williams' Estate decision articulates a fundamental principle: the mere occurrence of a

12 default judgment does not automatically endow all pleaded allegations with the force of

13 conclusively adjudicated facts. Specifically, the court delineated that preclusion should apply only

14 to issues where the record reflects an "express finding upon the allegation" sought to be precluded.

15 This critical distinction underscores that not all assertions within a complaint gain the immutable

16 status of "fact" merely through a default judgment. The court's silence on specific allegations — far

17 from being interpreted as tacit agreement or adjudication — maintains the allegation's status as

18 merely that: an unexamined claim.

19    This principle is further exemplified by referencing the court's reasoning in the context of

20 property disputes, as highlighted in Williams' Estate and reinforced by subsequent jurisprudence

21 such as *People v. Sims, 32 Cal.3d 468, 186 Cal.Rptr. 77, 651 P.2d 321 (1982).* These cases

22 collectively affirm that a court's failure to expressly address a pleaded allegation prevents it from

23 being elevated to a fact adjudicated for the purposes of issue preclusion.

24    In the context of the present case, this established legal doctrine bears significant relevance. The

25 Plaintiff's motion improperly leverages the absence of express findings in the default judgment as a

26 de facto adjudication of fraud and other substantive issues. This misapplication of preclusive

27 principles ignores the critical judicial safeguard against unwarranted extensions of issue preclusion

28

**OBJECTION TO MOTION FOR SUMMARY JUDGEMENT**

1  — a safeguard expressly designed to ensure that only genuinely litigated and expressly resolved

2  issues are precluded in subsequent proceedings.

3    By clarifying the limitations placed on issue preclusion, especially regarding default judgments,

4  this Court is invited to recognize the essential distinction between allegations that have been subject

5  to judicial scrutiny and those that have not. The thoughtful application of these principles reaffirms

6  the necessity for a thorough and deliberate examination of claims, particularly in cases involving

7  significant allegations such as fraud, before such claims can exert preclusive effects in subsequent

8  legal contexts.

9        This objection underscores a fundamental issue: neither the FINRA Award nor the

10  California State Court's confirmation thereof made any express finding regarding the alleged

11  fraudulent actions attributed to the Debtor. This absence of judicial determination is pivotal, as the

12  Plaintiff's motion erroneously relies on mere allegations within her Statement of Claim as definitive

13  proof of fraud. Such a reliance not only misconstrues the procedural and evidentiary standards

14  required for establishing fraud but also overlooks the critical distinction between allegations and

15  adjudicated facts.

16        Significantly, the Plaintiff's assertion, suggesting that evidence of fraud was presented and

17  litigated in relation to Award 23-00602, is factually incorrect. The record clearly shows that the

18  only arbitration proceeding in which the Plaintiff presented evidence against the Debtor was Case

19  ID 20-04139. **Exhibit 1** However, this arbitration did not result in findings supportive of the

20  Plaintiff's claims; rather, it concluded with a denial of all claims against the respondents, including

21  any implicating fraudulent conduct. The Award explicitly states: "After considering the pleadings,

22  the testimony, and evidence presented at the hearing, and any post-hearing submissions, the Panel

23  has decided in full and final resolution of the issues submitted for determination as follows: 1.

24  Claimant's claims are denied in their entirety. 2. Oppenheimer is liable for and shall pay to

25  Claimant the sum of $300.00 to reimburse Claimant for the non-refundable portion of the filing fee

26  previously paid to FINRA Dispute Resolution Services. 3. Any and all claims for relief not

27  specifically addressed herein, including any requests for punitive damages and attorneys' fees, are

28  denied." **Exhibit 2**

**OBJECTION TO MOTION FOR SUMMARY JUDGEMENT**

1      This outcome contrasts sharply with the proceedings of Award 23-00602, a default

2   arbitration proceeding in which, by procedural mandate of FINRA Rule 12801(c), no hearing was

3   held, and therefore, no substantive evidence could have been presented or litigated. The Plaintiff's

4   characterization of this award as evidence of fraud is, therefore, a misrepresentation.

5      The distinction between the outcomes of these two awards highlights a critical flaw in the

6   Plaintiff's argument for non-dischargeability. If the Debtor's actions were as egregious as claimed,

7   the supervisory entities, such as Oppenheimer & Co, would likely bear some liability, especially

8   given the regulatory framework governing financial entities and the precedent for holding

9   supervisors accountable for the actions of their subordinates. The comprehensive presentation of

10  evidence in Award 20-04139, which resulted in no favorable finding for the Plaintiff, underscores

11  the necessity of re-evaluating these claims through full litigation rather than summary judgment.

12     Furthermore, the stark difference in language between the two awards — with Award 20-

13  04139 detailing the consideration of evidence and testimony, as opposed to the cursory resolution in

14  Award 23-00602 — invalidates any claim of preclusive effect based on the default judgment. This

15  discrepancy, coupled with the Plaintiff's failure to acknowledge the critical outcomes of past

16  litigation, demonstrates a disregard for the procedural and factual nuances essential to a fair

17  assessment of the case.

18     The Plaintiff's motion for summary judgment therefore rests on a flawed interpretation of the

19  arbitration awards and a misrepresentation of the factual record. This Court should recognize these

20  deficiencies and deny the motion, allowing for the issues to be thoroughly litigated and adjudicated

21  on their merits.

22     A pivotal aspect of this objection hinges on the unequivocal absence of a finding of fraud in

23  both Award 20-04139 and Award 23-00602. Despite the comprehensive nature of the arbitration

24  proceedings, particularly in Award 20-04139, which involved a detailed review of claims and

25  evidence, there was a definitive lack of any adjudication indicating fraudulent conduct on the part of

26  the Debtor. This point bears significant weight, as the foundation of non-dischargeability claims

27  under 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), 523(a)(6), and 523(a)(19) necessitates a concrete

28  determination of fraud.

**OBJECTION TO MOTION FOR SUMMARY JUDGEMENT**

1    Further compounding this issue, Award 23-00602, even with its procedural posture as a

2    default proceeding, did not culminate in any express findings of fraud. The absence of such findings

3    is critical, given that requests for punitive damages—often indicative of fraudulent or malicious

4    behavior—were categorically denied. This denial underscores the absence of any judicial

5    recognition or validation of fraudulent conduct necessary to trigger the stringent criteria for non-

6    dischargeability outlined in the Bankruptcy Code. For example, in default arbitration award

7    underlying In re Behrends, 660 F. App'x 696 (10th Cir. 2016), the arbitration panel explicitly stated

8    that "The Panel found multiple violations of the Colorado state and federal securities laws (as

9    defined in Section 3(a) (47) of the SEC Act of 1934)." Similarly, in Fusco v. Decker, the

10    arbitrational specifically "specifically "found, based on clear and convincing evidence that,

11    Respondents Legend, A. Fusco [(i.e., the Debtor)], Decker, Meyer, and Misseri engaged in

12    intentional misconduct in excessively trading and churning Claimant's account; improperly

13    recording trades as unsolicited as opposed to solicited on account statements; fraudulently

14    misrepresenting or failing to disclose mark-ups and exorbitant commissions; failing…" *In re Fusco,*

15    *641 B.R. 438 (Bankr. E.D.N.Y. 2022).* No such statements are present in Award 20-04139.

16    In Re. Grogan v. Garner, Supreme Court Justice Stevens held that preponderance of the

17    evidence standard, rather than clear and convincing evidence standard, applies to all exceptions

18    from dischargeability of debts in Bankruptcy Code § 523(a), including nondischargeability for fraud

19    provision. "In light of application of preponderance of evidence standard of proof to

20    nondischargeability for fraud claims, all fraud claims which creditors have successfully reduced to

21    judgment will be nondischargeable in bankruptcy, under collateral estoppel, whether judgment was

22    based on preponderance of evidence or clear and convincing evidence standard of proof.

23    Bankr.Code, 11 U.S.C.A. SS." *Grogan v. Garner, 498 U.S. 279, 111 S. Ct. 654, 112 L. Ed. 2d 755*

24    *(1991)*

25    Critically, in Grogan v. Garner, the Bankruptcy Court found that elements of § 523(a) were

26    proved and demonstrated a preponderance of evidence standard. Such standard is not met for Award

27    20-04139 which makes no explicit mention of findings or conduct fitting the fraud provisions of §

28    532(a). Not only does California law narrow the scope of issue preclusion, but Federal case law

**OBJECTION TO MOTION FOR SUMMARY JUDGEMENT**

1  excepting "any" judgement from discharge has been based upon judgements exhibiting a

2  preponderance of evidence.

3      In light of these considerations, it is essential to discern the distinction between pleadings

4  and proven facts. The Plaintiff's reliance on allegations within her Amended Complaint and

5  Statement of Claim, absent adjudicative verification of such allegations, cannot substitute for the

6  requisite evidentiary standard needed to establish fraud. Pleadings, by their nature, are assertions

7  awaiting judicial examination and validation; they do not, in themselves, constitute evidence of

8  fraud or malfeasance.

9      This distinction is paramount when evaluating the claims under the specific sections of the

10  Bankruptcy Code mentioned. Without a judicial finding of fraud—explicitly articulated and

11  substantiated through due process—the leap to non-dischargeability lacks both legal and factual

12  foundation. As such, it is imperative for this Court to recognize the critical gap between the

13  pleadings presented by the Plaintiff and the stringent proof requirements for fraud under 11 U.S.C.

14  §§ 523(a)(2)(A), 523(a)(4), 523(a)(6), and 523(a)(19). The absence of such findings in the arbitral

15  awards directly challenges the premise of Plaintiff's non-dischargeability claims, underscoring the

16  necessity for a thorough and judicious examination rather than summary adjudication.

17

18  **III. MATERIAL DISPUTE AND LACK OF SUFFICIENT EVIDENTIARY BASIS FOR**

19  **SUMMARY JUDGEMENT**

20

21      In adversary proceedings before the bankruptcy court, the familiar summary judgment

22  standard established in Federal Rule of Civil Procedure 56 applies. See *Fed. R. Bankr.P. 7056;*

23  *North Slope Borough v. Rogstad (In re Rogstad), 126 F.3d 1224, 1227 (9th Cir. 1997).* Summary

24  judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any

25  affidavits show that there is no genuine issue as to any material fact and that the movant is entitled

26  to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" only if there is a

27  sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving

28

**OBJECTION TO MOTION FOR SUMMARY JUDGEMENT**

1    party, and a dispute is "material" only if it could affect the outcome of the suit under the governing

2    law. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91L.Ed.2d 202 ( 1986).*

3    The party moving for summary judgment has the burden of showing the absence of a genuine issue

4    of material fact. Id. at 256—57, 106 S.Ct. 2505. The court must view all the evidence in the light

5    most favorable to the nonmoving patty. *County of Tuolumne v. Sonora Cmty. Hosp., 236 F.3d 1148,*

6    *1154 (9th Cir.2001).*

7         A court "generally cannot grant summary judgment based on its assessment of the

8    credibility of the evidence presented." *Agosto v. INS, 436 U.S. 748, 756, 98 S.Ct. 2081, 56 L.Ed.2d*

9    *677 (1978).* "[Alt the summary judgment stage the judge's function is not himself to weigh the

10   evidence and determine the truth of the matter but to determine whether there is a genuine issue for

11   trial." *Anderson, 477 U.S. at 249, 106 S.Ct. 2505.*

12        As further detailed in the Debtor's Statement of Controverted Facts, not only are there

13   material disputes that can affect the outcome of the suit under governing law but genuine issues are

14   present on which a reasonable fact finder could find for Debtor. For example, Plaintiff's

15   withdrawals from her account totaling $177,000, the dismissal of claims in entirety for Award 20-

16   04139, the absence of any evidence presented for Award 23-00602, the absence of findings of fraud

17   by FINRA in Award 20-04139 and Award 23-00602, and Plaintiff's discretionary authority of her

18   account over the full duration of its existence. These genuine disputes are further backed up by the

19   evidence in **Exhibit 3** as well as Plaintiff's own admission of directing trades within her account.

20                    **IV.STATEMENT OF CONTROVERTED FACTS**

21        *A.Contravention of Statement of Uncontroverted Fact 5a*

22        In response to the Plaintiff's Statement of Uncontroverted Fact (SUF) 5a, the Debtor

23   disputes the assertion made regarding his status as a Broker and Investment Advisor registered and

24   regulated by the Financial Industry Regulatory Authority ("FINRA") "at all relevant times until his

25   suspension on about June 12, 2023." This portrayal inaccurately represents the Debtor's regulatory

26   oversight and professional affiliations during the pertinent periods.

27        The Debtor was indeed registered with FINRA, but only for specific intervals that do not

28   encompass the entire period alleged by the Plaintiff. Specifically, the Debtor's FINRA registration

**OBJECTION TO MOTION FOR SUMMARY JUDGEMENT**

1  was active from March 4, 2014, through May 4, 2017, while he was employed under Oppenheimer

2  & Co. as a stockbroker, as evidenced by Exhibit 1 attached hereto.

3       Subsequent to his tenure at Oppenheimer & Co., the Debtor transitioned to a role as an

4  independent contractor with Integrated Advisors Network LLC ("IAN"), doing business as Penguin

5  Capital Management ("PCM"). During this period, from April 21, 2017, until August 1, 2019, the

6  Debtor was not under the regulatory purview of FINRA but was instead regulated solely by the

7  State of California and the Securities and Exchange Commission (SEC).

8       In 2019, the Debtor ceased operations of PCM and subsequently became associated with

9  Hilltop Holdings Inc. ("Hilltop") from August 22, 2019, through July 6, 2020. While at Hilltop, the

10  Debtor was again subject to FINRA's regulations. Importantly, it is to be noted that at no point

11  during the Debtor's employment with Hilltop was the Plaintiff a customer of the Debtor.

12       The Debtor's regulatory oversight and professional affiliations significantly impact the

13  understanding of his responsibilities and the regulatory framework applicable during the timeframes

14  relevant to the Plaintiff's claims. The inaccuracies in the Plaintiff's statement overlook critical

15  distinctions in regulatory oversight and misrepresent the continuity of the Debtor's registration with

16  FINRA. Therefore, the Debtor respectfully requests that the Court recognize the inaccuracies in the

17  Plaintiff's characterization of the Debtor's professional and regulatory status as presented in SUF 5a.

18  The factual clarifications provided herein, supported by Exhibit 1, more accurately depict the

19  Debtor's regulatory oversight and professional affiliations relevant to the Plaintiff's claims. This

20  response underscores the necessity for a nuanced understanding of the Debtor's professional status

21  in evaluating the merits of the Plaintiff's claims.

22       **B. Contravention of Statement of Uncontroverted Fact 5b**

23       The Debtor disputes the Plaintiff's characterization in SUF 5b regarding the circumstances

24  surrounding her investment decisions following the sale of her primary residence. The assertion that

25  the proceeds from this sale, constituting approximately $300,000, were solely managed and invested

26  based on the Debtor's advice, without consideration of the Plaintiff's broader financial situation and

27  the involvement of her family members, is incomplete and misleading.

28

**OBJECTION TO MOTION FOR SUMMARY JUDGEMENT**

1    Contrary to the implications of SUF 5b, the Plaintiff's financial affairs and investment

2    decisions were not made in isolation or solely upon the advice of the Debtor. Instead, family

3    members played a significant and influential role in these decisions. The involvement of the

4    Plaintiff's family members provided her with additional perspectives and advice, contributing to a

5    collective decision-making process regarding her investment strategies.

6    The Plaintiff, with the input of her family members, portrayed a financial situation that

7    suggested a higher risk tolerance and an interest in more aggressive investment strategies than what

8    is implied in SUF 5b. This portrayal influenced the investment advice provided by the Debtor and

9    the subsequent investment decisions.

10    The omission of the significant role played by the Plaintiff's family members in her financial

11    affairs and investment decisions presents an incomplete picture of the factors influencing the

12    Plaintiff's choice to invest with the Debtor. Additionally, the portrayal of a different financial

13    situation by the Plaintiff and her family members directly impacted the nature of the investment

14    advice provided by the Debtor.

15    **C. Contravention of Statement of Uncontroverted Fact 5d**

16    The Debtor disputes the allegations made in SUF 5d that he assured the Plaintiff he would

17    secure her financial future through investments. This assertion misconstrues the nature of the

18    advisory relationship and ignores the regulatory framework governing financial advice.

19    As mandated by the Financial Industry Regulatory Authority (FINRA) and the Securities and

20    Exchange Commission (SEC), investment advisors, including the Debtor, are strictly prohibited

21    from making any guarantees regarding investments. This prohibition is clearly outlined in FINRA

22    Rule 2210, which prevents advisors from assuring the security of financial futures through

23    investment outcomes. The Debtor's communications with the Plaintiff were in full compliance with

24    these regulations, ensuring that no unlawful guarantees were made. There is no evidence or court

25    findings that Debtor was not in compliance.

26    The claim that the Debtor could guarantee the Plaintiff's financial future with an initial

27    investment of $300,000 is fundamentally flawed. Achieving a secure financial future on $300,000

28    with no further contributions through investments typically requires substantial returns, which are

- 14 -

**OBJECTION TO MOTION FOR SUMMARY JUDGEMENT**

1  often associated with higher risks. This reality contradicts the notion of guaranteed security and

2  underscores the implausibility of the Plaintiff's allegation.

3      Evidence directly contradicts the Plaintiff's claim that her investment with the Debtor was

4  solely for the purpose of securing her financial future. Between 2014 and 2019, the Plaintiff

5  withdrew $177,000 from her account, as documented in the Debtor's Answer and supported by

6  Exhibit 2. These withdrawals indicate that the Plaintiff's primary goal was generating current

7  income, rather than exclusively preserving capital for long-term security. The consistency of these

8  withdrawals with the Plaintiff's actions until the termination of the customer relationship further

9  disputes the claim of a singular investment objective.

10     The initial discussions between the Plaintiff and the Debtor, coupled with the Plaintiff's

11 subsequent financial behavior, reveal that generating immediate income was a significant objective

12 for the Plaintiff. This objective is consistent with the pattern of substantial withdrawals made from

13 the account, which directly challenges the Plaintiff's assertion regarding the intent of her

14 investment.

15     **D. Contravention of Statement of Uncontroverted Fact 5e**

16     The Debtor objects to the assertion presented in SUF 5e that he assured the Plaintiff of his

17 expertise and thereby influenced her decision to transfer her retirement savings to Oppenheimer

18 through him. This portrayal mischaracterizes the professional interaction between the Debtor and

19 the Plaintiff and misconstrues the nature of investment advice.

20     The Debtor did not provide the Plaintiff with personal assurances regarding his expertise

21 that would imply a guaranteed outcome of the investments. Conversations between the Debtor and

22 the Plaintiff were conducted in a manner consistent with industry standards, focusing on providing

23 information about investment options and potential risks, without making unwarranted promises or

24 guarantees about investment performance.

25     It is a fundamental principle of investing that returns are not guaranteed and cannot be

26 predicated solely on the expertise of an investment advisor. Investment markets are subject to a

27 wide range of variables, including economic conditions, market volatility, and unforeseen events,

28

**OBJECTION TO MOTION FOR SUMMARY JUDGEMENT**

1   which can impact returns. The Debtor communicated the inherent uncertainties of investing to the

2   Plaintiff, emphasizing that all investments carry some level of risk.

3        The Debtor's interactions with the Plaintiff were governed by the regulatory frameworks of

4   both FINRA and the SEC, which prohibit investment advisors from making misleading statements

5   or promises about the certainty of investment returns. Any discussions regarding the Debtor's

6   qualifications and the services provided were in compliance with these regulations, aimed at

7   informing the Plaintiff without overstepping ethical boundaries.

8        The decision by the Plaintiff to transfer her savings to Oppenheimer for investment purposes

9   was made based on a comprehensive evaluation of available information, and not solely on any

10  alleged assurances by the Debtor. The Plaintiff, as an informed investor, was encouraged to

11  consider the full spectrum of investment risks and opportunities.

12       The claim that the Debtor assured the Plaintiff of his expertise in a manner that guaranteed

13  investment success misrepresents the nature of the advisory relationship and the regulatory

14  environment in which such advice is given. Investment decisions are complex and influenced by

15  numerous factors beyond an advisor's control.

16  ***E. Contravention of Statement of Uncontroverted Fact 5f***

17       The Debtor disputes the assertion in SUF 5f that the Plaintiff transferred her life savings to

18  the Debtor based on assurances of securing her financial future, as previously addressed in the

19  response to SUF 5e. This claim misrepresents the nature of the advisory relationship and the

20  communications between the Debtor and the Plaintiff.

21       Consistent with the Debtor's response to SUF 5e, it is reiterated that the Debtor made no

22  assurances regarding the security of the Plaintiff's financial future through investments. The

23  discussions between the Debtor and the Plaintiff were in line with the standards of the financial

24  industry and regulatory requirements, focusing on available investment strategies and the inherent

25  risks, without making promises or guarantees about specific outcomes.

26       The Plaintiff's decision to transfer her retirement savings for investment purposes was not

27  predicated on personal assurances from the Debtor, as none were given. Instead, the decision was

28

**OBJECTION TO MOTION FOR SUMMARY JUDGEMENT**

1   based on a broader understanding of investment principles, potential risks, and opportunities, as is

2   customary in the context of professional investment advisory services.

3        The claim that the Plaintiff's transfer of savings was solely based on the Debtor's supposed

4   assurances overlooks the complexity of investment decision-making. Investors, including the

5   Plaintiff, weigh various factors, including their financial goals, risk tolerance, and market

6   conditions, in making investment decisions. The portrayal of the Plaintiff's decision as based solely

7   on assurances from the Debtor simplifies this nuanced process inaccurately.

8        SUF 5f, based on the premise of assurances that were never provided, fails to accurately

9   reflect the regulatory-compliant, professional interaction between the Debtor and the Plaintiff.

10  Investment decisions are inherently complex, and suggesting that the Plaintiff's actions were solely

11  based on non-existent assurances from the Debtor is misleading.

12  **F. Contravention of Statement of Uncontroverted Fact 5j**

13       The Debtor disputes the implication in SUF 5j that the investment in Foresight Energy LP

14  ("FELP") stock was unsuitable for the Plaintiff based on its performance from 2014 through

15  September 2016. This assertion inaccurately represents the timing and rationale behind the

16  investment recommendation and overlooks the comprehensive assessment conducted prior to

17  advising the Plaintiff to invest in FELP.

18       The Plaintiff was expressly excluded from investing in FELP during the earlier period of

19  2016, unlike other clients. This exclusion was due to FELP undergoing a balance sheet

20  restructuring, which at the time posed a risk profile exceeding the suitability threshold for the

21  Plaintiff's investment objectives. The assertion in SUF 5j fails to acknowledge this deliberate and

22  prudent exclusion based on suitability considerations.

23       It was only after FELP successfully restructured its balance sheet, aligning its risk and return

24  profile with the Plaintiff's investment objectives, that the Plaintiff was advised to invest. The

25  decision to recommend FELP as an investment to the Plaintiff was contingent upon this

26  restructuring, which aimed to stabilize the company and align it more closely with the Plaintiff's

27  goals for income generation and capital preservation.

28

**OBJECTION TO MOTION FOR SUMMARY JUDGEMENT**

1    The claim that volatility and stock concentration inherently render an investment unsuitable

2  misrepresents the multifaceted nature of investment suitability assessment. Suitability is determined

3  by considering multiple factors, including but not limited to the investor's financial goals, risk

4  tolerance, investment horizon, and the overall composition of their investment portfolio. In the case

5  of the Plaintiff, these factors were carefully evaluated before recommending FELP as a suitable

6  investment.

7    Before advising the Plaintiff to invest in FELP, a thorough analysis was conducted, taking

8  into account the company's post-restructuring financial health, market conditions, and the Plaintiff's

9  investment profile. This comprehensive assessment aimed to ensure that the recommendation was

10  aligned with the Plaintiff's stated objectives and risk tolerance.

11    SUF 5j's portrayal of FELP stock as inherently unsuitable based on its performance before

12  September 2016 and without considering the balance sheet restructuring overlooks the nuanced and

13  careful approach taken in making investment recommendations. Suitability assessments involve a

14  broad range of considerations, and the Debtor's recommendation was based on a detailed analysis

15  consistent with the Plaintiff's investment objectives.

16    The Plaintiff has also not met the legal burden of demonstrating that any alleged

17  misrepresentation or omission by the Debtor regarding FELP stock was material. According to the

18  Supreme Court in Matrixx Initiatives, Inc. v. Siracusano and Basic Inc. v. Levinson, materiality

19  requires that the undisclosed information would have significantly altered the total mix of

20  information made available to a reasonable investor. *Basic Inc. v. Levinson, 485 U.S. 224, 108 S.Ct.*

21  *978, 99 L.Ed.2d 194 (1988) Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 131 S.Ct. 1309, 179*

22  *L.Ed.2d 398 (2011)* Furthermore, Berson v. Applied Signal Tech., Inc. defines a misleading

23  statement under Rule 10b-5 as one that suggests a state of affairs materially different from what

24  exists. *Berson v. Applied Signal Technology, Inc., 527 F.3d 982 (9th Cir. 2008)*

25    Contrary to the Plaintiff's claims, information regarding the volatility of FELP stock was

26  publicly available and accessible through monthly statements, trade confirmations, and ongoing

27  communications. This ensured that the Plaintiff was well-informed of FELP's market performance,

28

**OBJECTION TO MOTION FOR SUMMARY JUDGEMENT**

1  countering the assertion that the Debtor failed to disclose material information about the stock's

2  stability.

3      The Plaintiff's focus on the period's volatility fails to account for unforeseeable external

4  events that impacted FELP stock, such as the tragic death of FELP's founder Chris Cline, a

5  significant flood affecting product transportation, and the COVID-19 pandemic. These events,

6  beyond the Debtor's control, contributed to the stock's performance in ways that could not have

7  been anticipated.

8      Highlighting the unpredictability of these events, the Debtor himself suffered significant

9  financial losses from investing in FELP, including nearly the full loss of his parents' investment.

10 This personal outcome underscores that the Debtor did not have advance knowledge of the adverse

11 events affecting FELP and believed in the stock's potential based on the information available at the

12 time.

13    **G. Contravention of Statement of Uncontroverted Fact 51**

14     The Debtor disputes the Plaintiff's assertion in SUF 51 that he failed to inform her of the true

15 status of FELP stock, kept her fully committed to the FELP investment against her interests, and did

16 not advise on diversification. This portrayal inaccurately reflects the management of the Plaintiff's

17 investment and overlooks several critical aspects of their advisory relationship and external events

18 impacting FELP stock.

19     Contrary to the Plaintiff's claims, the Debtor actively managed and consistently reduced the

20 Plaintiff's position in FELP from 2016 onwards as its risk profile changed and per the Plaintiff's

21 instructions to sell the stock. This strategy was part of a prudent approach to adjust the Plaintiff's

22 investment in response to evolving market conditions and risk assessments.

23     Throughout the entire period of her investment, the Plaintiff received monthly statements

24 and had online access to her account, enabling her to stay informed about the status of her

25 investments, including her holdings in FELP. This level of transparency provided the Plaintiff with

26 continuous insight into her investment portfolio.

27     The Plaintiff did not have an investment advisory contract with Penguin Capital

28 Management (PCM), which inherently limited the scope of advice the Debtor could provide. The

**OBJECTION TO MOTION FOR SUMMARY JUDGEMENT**

1   advisory relationship was thus constrained by the absence of a formal contract, affecting the breadth

2   of guidance and recommendations the Debtor was permitted to offer.

3        The Debtor, like other investors and advisors, could not have anticipated the series of

4   unforeseeable and tragic events that adversely impacted FELP stock. These included the untimely

5   death of FELP's founder Chris Cline in a helicopter crash, a significant flood disrupting the

6   transportation of FELP's product, and the unprecedented global effects of the COVID-19 pandemic.

7   These external factors, beyond the Debtor's control, significantly influenced FELP's stock

8   performance in the final months of holding the investment for clients.

9        Highlighting the unpredictability of these events, the Debtor had also invested a substantial

10   portion of his own family's money in FELP, based on the same analysis and belief in the stock's

11   potential that he shared with the Plaintiff. The near-total loss of funds experienced by his parents

12   underscores the Debtor's own unexpected financial detriment due to these unforeseeable

13   circumstances.

14        The Plaintiff's assertion fails to account for the active management of her investment, the

15   transparency and access to information provided, the limitations imposed by the lack of a formal

16   advisory contract, and the significant impact of unforeseeable external events on FELP stock. These

17   elements collectively challenge the claim that the Debtor misled the Plaintiff or failed to act in her

18   best interest.

19        The Debtor was not an insider for FELP and, consequently, did not possess nor withhold any

20   undisclosed critical information that could have significantly influenced the Plaintiff's investment

21   decisions. The Plaintiff's allegation overlooks the fact that the Debtor, like the Plaintiff and the

22   general investing public, relied on publicly available information to make investment

23   recommendations.

24        Throughout 2018 and 2019, several clients of Penguin Capital Management (PCM), who

25   held positions in FELP, opted to either sell their holdings or transfer their accounts to other

26   investment advisors. These decisions were made using the same publicly available information that

27   was accessible to the Plaintiff. This underscores that all clients, including the Plaintiff, were

28

**OBJECTION TO MOTION FOR SUMMARY JUDGEMENT**

1    equipped with the necessary information to make informed decisions regarding their investments in

2    FELP.

3          Had the Debtor been privy to any information that could have averted the losses experienced

4    by his family, friends, and clients, such information would surely have been acted upon to prevent

5    the financial distress that ensued. The assertion that the Debtor failed to inform the Plaintiff of the

6    risks associated with FELP stock fails to consider the Debtor's own significant losses and the lack of

7    foreknowledge regarding the stock's downturn.

8    **H.Contravention of Statement of Uncontroverted Fact 5n**

9          The Debtor disputes the implication in SUF 5n that the failure to execute the Plaintiff's

10   instruction to sell her entire Foresight Energy LP ("FELP") position reflects negligence or

11   intentional disregard of the Plaintiff's investment directives. This interpretation overlooks the

12   Plaintiff's autonomy over her investment decisions and the subsequent rectification of the trade

13   error.

14         The incident where the Plaintiff's instruction to sell her FELP shares was not executed does

15   not diminish the fact that the Plaintiff maintained full authority and control over her brokerage

16   account. This situation, while unfortunate, serves to underscore the Plaintiff's active role and

17   decision-making capacity in managing her investments.

18         Upon discovery of the oversight in not executing the sale of the FELP position as instructed

19   by the Plaintiff, immediate steps were taken to identify and rectify the trade error. The resolution of

20   this issue involved a thorough review of the circumstances leading to the oversight and the

21   implementation of corrective measures.

22         As a direct response to the trade error and in recognition of the inconvenience and potential

23   impact on the Plaintiff's investment strategy, the Plaintiff was compensated for the proceeds she

24   would have received had the sale been executed as originally instructed. This compensation was

25   facilitated through a wire transfer to the Plaintiff, providing tangible remediation for the error. The

26   details and confirmation of this compensation are documented in Exhibit [specify the exhibit

27   number or letter].

28

**OBJECTION TO MOTION FOR SUMMARY JUDGEMENT**

1    The failure to execute the Plaintiff's sale instruction, while regrettable, was addressed with

2    full transparency and responsibility. The subsequent compensation to the Plaintiff affirms the

3    commitment to uphold the integrity of her investment objectives and rectify errors when they occur.

4    This incident and its resolution highlight the collaborative nature of the advisory relationship,

5    emphasizing the Debtor's dedication to the Plaintiff's financial well-being.

6    *I.Contravention of Statement of Uncontroverted Fact 5p*

7    The Debtor disputes the assertion made in SUF 5p that the Plaintiff's holdings were

8    worthless as of December 31, 2019. This statement inaccurately represents the financial outcome of

9    the Plaintiff's investment and fails to account for the actions taken to mitigate loss and provide the

10   Plaintiff with the proceeds of her investments.

11   Contrary to the claim that the holdings were worthless, the Plaintiff did, in fact, instruct a

12   full sale of her investment holdings, which was executed through a trade correction. The proceeds

13   from this sale were transferred to the Plaintiff via a wire transfer, thereby providing her with

14   tangible financial returns from her investment, contrary to the assertion of worthlessness.

15   Since the establishment of the investment account, the Plaintiff had actively managed and

16   withdrawn funds, totaling $177,000, which includes the final wire transfer. These withdrawals

17   signify that the Plaintiff received substantial financial benefits from her investments over time,

18   further disputing the claim that her holdings were rendered worthless.

19   The narrative that the Plaintiff's investments were entirely without value by the end of 2019

20   overlooks the cumulative financial benefits received through withdrawals and the final sale of her

21   holdings. The account management and disbursement of funds through the wire transfer

22   demonstrate that the Plaintiff's investment strategy, despite market fluctuations and the inherent

23   risks of investing, resulted in recoverable assets, not a total loss.

24   *J.Contravention of Statement of Uncontroverted Fact 5q*

25   The Debtor disputes the implication in SUF 5q that the Plaintiff was solely reliant on

26   dividends from her investments for her future livelihood and had lost everything as a result of the

27   investment decisions. This portrayal inaccurately reflects the Plaintiff's complete financial situation,

28   which included additional sources of support not disclosed in the Plaintiff's statement.

**OBJECTION TO MOTION FOR SUMMARY JUDGEMENT**

1    Contrary to the portrayal in SUF 5q, the Debtor was informed and aware that the Plaintiff's

2    financial picture was more comprehensive than represented. Specifically, the Plaintiff was receiving

3    financial support from her sister and brother-in-law, which contributed to her overall financial

4    stability and resources. This support was a significant aspect of her financial situation and

5    influenced the Debtor's understanding of her financial resilience and capacity to absorb investment

6    risks.

7    The assertion that the Plaintiff intended to live the rest of her life solely on dividends earned

8    from her investments, and that she has now lost everything, overlooks this crucial aspect of her

9    financial support system. The additional financial support from family members indicates that the

10    Plaintiff had other means of financial security beyond the investments managed by the Debtor.

11    The knowledge of the Plaintiff's additional financial support played a role in tailoring her

12    investment strategy. Understanding that the Plaintiff had a broader financial safety net allowed for a

13    more nuanced approach to managing her investment portfolio, including considerations of risk

14    tolerance and investment objectives that aligned with her overall financial picture.

15    **K. Contravention of Statement of Uncontroverted Fact 5r**

16    The Debtor contests the assertion in SUF 5r regarding the nature of the professional

17    relationship and reliance placed by the Plaintiff on the Debtor's investment decisions. The claim that

18    the Plaintiff trusted and relied upon the Debtor as a qualified investment advisor mischaracterizes

19    the scope and nature of their professional engagement.

20    The Debtor clarifies that his professional interactions with the Plaintiff were strictly in the

21    capacity of a qualified stockbroker and not as an investment advisor. This distinction is crucial as it

22    defines the scope of services provided and the nature of advice offered to the Plaintiff.

23    Contrary to the implications of SUF 5r, there was no executed contract between the Debtor

24    and the Plaintiff that would establish a formal investment advisory relationship. The services

25    provided to the Plaintiff were consistent with those of a stockbroker, which include executing trades

26    and providing general investment information, rather than offering personalized investment advice

27    under a fiduciary standard.

28

**OBJECTION TO MOTION FOR SUMMARY JUDGEMENT**

1    The assertion that the Plaintiff trusted and relied upon the Debtor as if he were her

2    investment advisor does not accurately reflect the contractual and regulatory framework within

3    which the Debtor operated. Without a formal contract delineating the Debtor as an investment

4    advisor, the expectations for personalized, fiduciary-level advice were not applicable to their

5    professional relationship.

6    The Debtor's actions and recommendations were made in compliance with the regulatory

7    standards applicable to stockbrokers, which differ from those governing investment advisors. The

8    Debtor maintained transparency about the scope of his role and the limitations on the type of advice

9    he could provide without an investment advisory contract in place.

10   **L.Contravention of Statement of Uncontroverted Fact 5s**

11   The Debtor disputes the portrayal of the Plaintiff's financial situation as presented in SUF

12   5s. The depiction in the Plaintiff's pleadings does not align with the comprehensive financial picture

13   communicated to the Debtor, which included additional sources of support and a broader context for

14   her investment decisions.

15   The financial picture of the Plaintiff as understood by the Debtor during their professional

16   engagement significantly differs from that portrayed in her pleadings. This discrepancy arises from

17   the Plaintiff's omission of crucial information regarding additional financial support from family

18   members and the overall financial strategy she employed.

19   As previously mentioned in response to SUF 5q, the Plaintiff was receiving financial

20   support from her sister and brother-in-law, which played a critical role in her overall financial

21   stability. This support was a vital component of her financial landscape, yet it has been

22   conspicuously absent from the portrayal of her financial situation in the pleadings.

23   The broader financial support available to the Plaintiff influenced the investment strategy

24   and recommendations provided by the Debtor. Understanding that the Plaintiff had a safety net

25   beyond the investments in question allowed for a more nuanced approach to risk tolerance and

26   investment objectives.

27

28

**OBJECTION TO MOTION FOR SUMMARY JUDGEMENT**

1    The Plaintiff's pleadings suggest a level of reliance on the investment returns that does not

2  fully account for the comprehensive financial support system in place. This misrepresentation skews

3  the perception of her financial needs and the basis of her investment decisions.

4    The discrepancy between the Plaintiff's financial situation as portrayed in her pleadings and

5  the more comprehensive picture known to the Debtor raises concerns about the accuracy and

6  completeness of the information presented to the Court. It is crucial for the Court to consider the

7  full context of the Plaintiff's financial situation, including external sources of support, to accurately

8  assess the appropriateness of the investment strategy and the Debtor's role.

9  **M.Contravention of Statement of Uncontroverted Fact 5t**

10    The Debtor disputes the assertion in SUF 5t that he acknowledged or affirmatively

11  represented failing to make appropriate investment decisions for the Plaintiff. This portrayal

12  inaccurately reflects the Debtor's communications regarding the support available to clients who

13  experienced investment losses.

14    The communication by the Debtor to the Plaintiff regarding the investment decisions and the

15  resultant losses was not an acknowledgment of failure in making those investment decisions.

16  Instead, the Debtor informed the Plaintiff about the availability of funds designated for clients who

17  had experienced losses, as part of a broader initiative to support clients adversely affected by market

18  conditions.

19  **V. OBJECTION TO PLAINTIFF'S CLAIM FOR NON-DISCHARGEABILITY UNDER 11**

20  **U.S.C. § 523(a)(2)(A)**

21    The Debtor reasserts that the Plaintiff's claim for non-dischargeability under 11 U.S.C. §

22  523(a)(2)(A) lacks sufficient factual and legal foundation, failing to meet the stringent requirements

23  for establishing non-dischargeability under the cited statute. Accordingly, Plaintiff has not, and

24  cannot, establish the necessary elements for the debt to be excepted from discharge pursuant to

25  section 523(a)(2)(A).

26  **1. Absence of False Pretenses, a False Representation, or Actual Fraud**

27

28

**OBJECTION TO MOTION FOR SUMMARY JUDGEMENT**

The core of section 523(a)(2)(A) requires the creditor to prove that the debtor obtained money, property, services, or credit through false pretenses, a false representation, or actual fraud. The Debtor reasserts that:

The Plaintiff has not provided conclusive evidence that the Debtor engaged in any false pretenses, made any false representation, or committed actual fraud in the incurrence of the debt in question.

The allegations presented by the Plaintiff lack specificity and fail to detail how any purported misrepresentation by the Debtor was material to the transaction that resulted in the debt.

**2.Reliance on the Alleged Misrepresentation**

For a debt to be non-dischargeable under section 523(a)(2)(A), the creditor must also demonstrate that they justifiably relied on the debtor's misrepresentation. The Debtor maintains that:

The Plaintiff has not established that she justifiably relied on any statement or conduct of the Debtor. The evidence, or lack thereof, does not support a finding of reasonable reliance.

Any decisions made by the Plaintiff regarding the transaction leading to the debt were based on factors independent of any alleged representations by the Debtor.

**3. Causation and Damages**

The Plaintiff must prove that the alleged fraud directly caused the debt in question. The Debtor argues that:

The Plaintiff cannot demonstrate a direct causal link between any alleged misrepresentation by the Debtor and the incurrence of the debt.

The damages claimed by the Plaintiff are not a direct result of any action or representation made by the Debtor.

The Debtor reasserts that the Plaintiff's claim for non-dischargeability under section 523(a)(2)(A) is without merit and does not meet the requisite legal standard. Therefore, the Debtor respectfully requests that this Court deny the Plaintiff's claim and grant the Debtor discharge of the debt in accordance with the principles and protections afforded by the Bankruptcy Code.

**OBJECTION TO MOTION FOR SUMMARY JUDGEMENT**

## VI. OBJECTION TO PLAINTIFF'S CLAIM FOR NON-DISCHARGEABILITY UNDER 11 U.S.C. § 523(a)(4)

The Debtor contends that the Plaintiff has not established the requisite legal and factual basis for non-dischargeability under the provisions of 11 U.S.C. § 523(a)(4) of this claim and, as such, the debt should be deemed dischargeable.

### 1. Fiduciary Capacity Not Established

To invoke section 523(a)(4), it must be shown that the Debtor acted in a fiduciary capacity at the time the debt was incurred. The Debtor asserts that:

The relationship between the Debtor and the Plaintiff did not constitute a fiduciary relationship under the law. The necessary elements to establish such a relationship, including a manifest intent to create a fiduciary relationship and the acceptance of fiduciary duties, were absent.

The Plaintiff has failed to identify any statutory or contractual basis that would elevate the Debtor's obligations to the level of a fiduciary duty as contemplated under § 523(a)(4).

### 2. No Evidence of Fraud, Embezzlement, or Larceny

For a debt to be non-dischargeable under this section, there must be evidence of fraud, embezzlement, or larceny. The Debtor maintains that the Plaintiff has not provided substantive evidence of any act of embezzlement, larceny, or fraud committed by the Debtor. Allegations alone are insufficient to meet the stringent proof requirements necessary for non-dischargeability under § 523(a)(4). The transactions that led to the debt's incurrence were conducted in good faith and in the ordinary course of business, with no intent to defraud or unlawfully appropriate property.

### 3. Defalcation While Acting in a Fiduciary Capacity Not Proven

Even if a fiduciary relationship were established, the Plaintiff must still prove defalcation occurred within that context. The Debtor argues that there has been no demonstration of defalcation, which requires an intentional wrong, negligence, or recklessness of a fiduciary duty. The evidence does not support any such finding against the Debtor. The Plaintiff's claim lacks specificity and fails to articulate how any alleged actions of the Debtor meet the legal definition of defalcation under § 523(a)(4).

**OBJECTION TO MOTION FOR SUMMARY JUDGEMENT**

1    Accordingly, the Debtor seeks a determination that the debt is dischargeable and that the

2  Plaintiff's claim under § 523(a)(4) be denied for lack of evidence and legal foundation. Such a

3  determination would align with the principles of fairness and justice that underpin the Bankruptcy

4  Code's protective framework for debtors.

5

6

7  **VII. OBJECTION TO PLAINTIFF'S CLAIM FOR NON-DISCHARGEABILITY UNDER
    11 U.S.C. § 523(a)(6)**

8

9  The Debtor challenges the Plaintiff's claim for non-dischargeability under 11 U.S.C. § 523(a)(6) on

10  the grounds that it does not meet the necessary criteria for establishing that the actions in question

11  were willful and malicious as defined by the Bankruptcy Code.

12  **1.Lack of Willfulness**

13    For a debt to be non-dischargeable under § 523(a)(6), the Plaintiff must prove that the debtor's

14  conduct was willful, implying an intentional act to cause injury. The Debtor contends that the

15  actions leading to the debt were not undertaken with the intent to cause injury. Any harm resulting

16  from the Debtor's actions was unintentional and a consequence of circumstances beyond the

17  Debtor's control. The Plaintiff has not presented credible evidence to show that the Debtor acted

18  with the deliberate objective to cause harm, which is a prerequisite for establishing willfulness

19  under § 523(a)(6).

20  **2.Absence of Malicious Intent**

21    Additionally, the claim under § 523(a)(6) requires proof of malice, meaning the act was

22  done with wrongful intent or without just cause or excuse. The Debtor argues that there is no

23  evidence to support the claim that the Debtor acted with malice. The transactions or events leading

24  to the debt did not stem from a wrongful intent or a disregard for the rights of the Plaintiff.

25    The Debtor's actions were carried out in good faith, within the bounds of ordinary business

26  practices, and without any intention to harm the Plaintiff or their property.

27  **3. Failure to Prove Willful and Malicious Injury**

28

**OBJECTION TO MOTION FOR SUMMARY JUDGEMENT**

1    The conjunction of willfulness and malice sets a high bar for non-dischargeability under §

2  523(a)(6), requiring clear and convincing evidence that the Debtor intended to cause injury that was

3  both willful and malicious. The Debtor maintains that the Plaintiff's allegations fail to

4  comprehensively demonstrate that the Debtor's conduct meets the stringent standard of willful and

5  malicious injury as required for non-dischargeability under this provision. The evidence presented

6  by the Plaintiff does not substantiate a direct and deliberate intention by the Debtor to cause harm,

7  thereby failing to satisfy the legal criteria for non-dischargeability under § 523(a)(6).

8    In light of the above arguments, the Debtor respectfully requests that this Court find the debt

9  in question to be dischargeable under the Bankruptcy Code. The Plaintiff has not met the burden of

10  proof necessary to establish that the debt arose from an act of willful and malicious injury by the

11  Debtor. Therefore, the Debtor seeks a ruling from this Court denying the Plaintiff's claim for non-

12  dischargeability under § 523(a)(6) and affirming the dischargeability of the debt, consistent with the

13  protective intent and rehabilitative purposes of the Bankruptcy Code.

14  **VIII. OBJECTION TO PLAINTIFF'S CLAIM FOR NON-DISCHARGEABILITY UNDER**

15  **11 U.S.C. § 523(a)(19)**

16    The Debtor disputes the Plaintiff's claim for non-dischargeability under 11 U.S.C. §

17  523(a)(19)on the basis that it fails to adequately demonstrate that the debt meets the criteria outlined

18  in § 523(a)(19) of the Bankruptcy Code.

19  **1. No Violation of Securities Laws**

20    The Debtor reasserts that the Plaintiff has not provided conclusive evidence that the debt in

21  question arose from a violation of federal or state securities laws. The allegations lack specificity

22  and fail to pinpoint any precise statutory or regulatory provision that was purportedly violated. The

23  activities that led to the incurrence of the debt were conducted in compliance with applicable

24  securities laws and regulations. The Debtor engaged in no act that constitutes fraud, deceit, or

25  manipulation within the context of securities transactions.

26  **2. Absence of Fraud or Deceit in a Fiduciary Capacity**

27    Furthermore, § 523(a)(19) requires evidence of fraud or deceit in a fiduciary capacity related

28  to the purchase or sale of securities. The Debtor contends that the relationship between the Debtor

1   and the Plaintiff did not establish a fiduciary capacity that is prerequisite for this provision to apply.

2   Any transactions or dealings between the parties were not governed by fiduciary duties as defined

3   under relevant securities law.

4       The Plaintiff's claim lacks evidence of any fraudulent or deceitful conduct by the Debtor. The

5   allegations do not substantiate claims of intentional misrepresentation or deceitful behavior that

6   would warrant non-dischargeability under this section.

7   **3. Conduct Related to the Purchase or Sale of Securities Not Applicable**

8       Regarding the aspect of § 523(a)(19) concerning the purchase or sale of securities, the Debtor

9   maintains that the debt did not arise from the purchase or sale of securities as contemplated by §

10  523(a)(19). The Plaintiff's claim does not accurately reflect the nature of the transactions that led to

11  the debt. The evidence presented by the Plaintiff does not establish a direct link between the alleged

12  wrongful conduct and the specific securities transactions that would trigger the application of §

13  523(a)(19).

14      Based on the arguments presented above, the Debtor respectfully requests that this Court find

15  the debt in question to be dischargeable under the Bankruptcy Code. The Plaintiff has not met the

16  stringent burden of proof required to establish non-dischargeability under 11 U.S.C. § 523(a)(19).

17  Therefore, the Debtor seeks a judgment from this Court affirming the dischargeability of the debt,

18  thus upholding the principles of fairness and the fresh start objective central to the Bankruptcy

19  Code.

20  **IX.REQUEST FOR SANCTIONS AGAINST PLAINTIFF FOR PREMATURE MOTION**

21  **FOR SUMMARY JUDGMENT**

22      Upon consideration of the Plaintiff's Motion for Summary Judgment, the Debtor respectfully

23  requests that this Court not only deny the motion due to its lack of merit but also impose appropriate

24  sanctions against the Plaintiff. This request is predicated on the necessity to deter the premature or

25  speculative filing of summary judgment motions that burden the court and opposing parties without

26  substantive legal grounds.

27      The filing of a Motion for Summary Judgment should be predicated on clear, undisputed facts

28  that unequivocally warrant judgment as a matter of law, absent any genuine issues of material fact.

**OBJECTION TO MOTION FOR SUMMARY JUDGEMENT**

1  However, when such motions are filed absent these criteria, it suggests a tactical maneuver aimed at

2  placing undue pressure on the defendant or to gain an unwarranted preview of the defendant's legal

3  strategy. This misuse of the summary judgment process not only detracts from the efficiency of the

4  judicial system but also compromises the fairness and equity of litigation.

5         As demonstrated in this to Objection to Plaintiff's Motion for Summary Judgment, there are

6  clear disputed facts which do not warrant judgement. It would be incredulous to argue otherwise as

7  the FINRA Award made no findings of fraud and do not entitle preclusive effect to debts owed by

8  Debtor. Plaintiff has been unfairly injured by multiple allegations of fraud which has diminished his

9  efforts to find employment and requests that such allegations be properly litigated in order to obtain

10 a fresh start in life. Google searches for Defendant result in multiple front page results with such

11 allegations of fraud, of which has never been found by regulators.

12        Sanctions are warranted in this instance to underscore the seriousness of filing a Motion for

13 Summary Judgment without due consideration and adherence to the legal standards governing its

14 use. Such sanctions would serve as a deterrent to the Plaintiff and similarly situated parties,

15 encouraging a more thoughtful and responsible approach to litigation and the use of court resources.

16                                     **X.CONCLUSION**

17        In light of the foregoing arguments and evidence presented, it is abundantly clear that the

18 Plaintiff's motion for summary judgment fails to meet the requisite legal standards and is premised

19 on a misinterpretation of both the facts and the applicable law. The absence of express findings of

20 fraud in the arbitration awards, coupled with a misrepresentation of the evidence and proceedings,

21 underscores the necessity for a comprehensive judicial examination rather than summary

22 disposition.

23        California's nuanced approach to issue preclusion, particularly concerning default

24 judgments, further illustrates the impropriety of granting summary judgment based on unlitigated

25 allegations lacking explicit finding of fraud. The established legal principles and case law mandate

26 careful and detailed consideration of issues, ensuring that only genuinely adjudicated matters may

27 invoke preclusion.

28

**OBJECTION TO MOTION FOR SUMMARY JUDGEMENT**

1        This Court is therefore respectfully urged to consider the substantive gaps and procedural

2    missteps outlined in this objection. The Plaintiff has not demonstrated an entitlement to judgment as

3    a matter of law, nor has she provided undisputed evidence that conclusively establishes the non-

4    dischargeability of the debt under 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), 523(a)(6), and 523(a)(19).

5    Genuine issues of material fact remain, particularly concerning the allegations of fraud and their

6    requisite legal and factual substantiation.

7        Accordingly, Defendant requests that this Honorable Court deny the Plaintiff's Motion for

8    Summary Judgment in its entirety. Granting such a motion would not only contravene the

9    procedural and substantive safeguards inherent in our legal system but also deny the Debtor the full

10   and fair trial that is both warranted and necessary to justly resolve the disputes at hand.

11

12

13

14

15   Dated: February 6th, 2024 By: /s/ _Dennis Phillip Ayre_, In Pro Per

16     Dennis Phillip Ayre

17

18

19

20

21

22

23

24

25

26

27

28

- 32 -

**OBJECTION TO MOTION FOR SUMMARY JUDGEMENT**

1

# EXHIBIT 1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**OBJECTION TO MOTION FOR SUMMARY JUDGEMENT**

**Award**
**FINRA Dispute Resolution Services**

In the Matter of the Arbitration Between:

Claimant                                    Case Number: 20-04139
Susan Shapiro Cowan

     vs.

Respondents                                 Hearing Site: Los Angeles, California
Oppenheimer & Co., Inc.
Pershing Advisor Solutions LLC
Integrated Advisors Network LLC
Dennis Phillip Ayre

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

Nature of the Dispute: Customer vs. Members, Associated Person, and Non-Member

At the time of panel appointment, this case had a majority-public panel.  During the life of the case, Arbitrator Thomas Shuck's classification changed, resulting in a majority-nonpublic panel.

The evidentiary hearing was conducted partially by videoconference.

## <u>REPRESENTATION OF PARTIES</u>

For Claimant Susan Shapiro Cowan ("Claimant"): Daniel R. Gutenplan, Esq., Enenstein Pham & Glass LLP, Costa Mesa, California.

For Respondent Oppenheimer & Co., Inc. ("Oppenheimer"): Justin M. Garbaccio, Esq., Oppenheimer & Co. Inc., New York, New York.

For Respondent Pershing Advisor Solutions LLC ("Pershing"): Jodi S. Cohen, Esq., Keesal, Young & Logan, Long Beach, California.

Respondent Dennis Phillip Ayre ("Ayre") appeared pro se.

Respondent Integrated Advisors Network LLC ("Integrated Advisors") did not enter an appearance in this matter.

Hereinafter, Oppenheimer, Pershing, Ayre, and Integrated Advisors will collectively be referred to as "Respondents."

## CASE INFORMATION

Statement of Claim filed on or about: December 21, 2020.
Claimant signed the Submission Agreement: December 21, 2020.

Statement of Answer filed by Oppenheimer on or about: March 12, 2021
Oppenheimer signed the Submission Agreement: March 12, 2021.
Statement of Answer filed by Pershing on or about: May 17, 2021.
Pershing signed the Submission Agreement: May 17, 2021.
Ayre did not sign the Submission Agreement.
Integrated Advisors did not sign the Submission Agreement.

## CASE SUMMARY

In the Statement of Claim, Claimant asserted the following causes of action: breach of fiduciary
duties and negligence. The causes of action relate to Foresight Energy LP ("FELP") stock.

In its Statement of Answer, Oppenheimer denied the allegations made in the Statement of Claim
and asserted various affirmative defenses.

In its Statement of Answer, Pershing denied the allegations made in the Statement of Claim and
asserted various affirmative defenses.

## RELIEF REQUESTED

In the Statement of Claim, Claimant requested:

1. Substantial damages in an amount in excess of $300,000.00;
2. Punitive and exemplary damages as allowed by law, to include California Code of Civil
   Procedure § 3294, in an amount sufficient to punish and make an example of
   Respondents;
3. Costs;
4. Attorneys' fees;
5. Pre and post judgment interest; and
6. Such other and further relief as the Panel may deem just and proper.

In its Statement of Answer, Oppenheimer requested:

1. Claimant's Statement of Claim be dismissed in its entirety;
2. Costs; and
3. Such other and further relief as the Panel deems just and equitable.

In its Statement of Answer, Pershing did not set forth a specific request for relief.

At the hearing, Claimant increased the request for relief to include a range of $489,027.00 to
$568,621.35.

## OTHER ISSUES CONSIDERED AND DECIDED

The Arbitrators acknowledge that they have each read the pleadings and other materials filed by the parties.

Ayre did not file a properly executed Submission Agreement but is required to submit to arbitration pursuant to the Code of Arbitration Procedure ("Code") and is bound by the determination of the Panel on all issues submitted.

Respondent Integrated Advisors is not a member or associated person of FINRA and did not voluntarily submit to arbitration. Therefore, the Panel made no determination with respect to the claims against Respondent Integrated Advisors.

Arbitrator Thomas Shuck was classified as public at the time of appointment to the Panel in this matter. In the interim, Arbitrator Thomas Shuck's arbitrator classification changed to non-public.

On December 22, 2021, Claimant filed a notice dismissing Respondent Pershing with prejudice.

On May 4, 2022, Oppenheimer filed a Motion for Sanctions against Claimant. On May 16, 2022, Claimant filed an opposition to the Motion for Sanctions. On May 23, 2022, Oppenheimer filed a reply in support of the Motion for Sanctions. On June 2, 2022, the Panel denied the motion.

On March 6, 2023, Claimant filed a request for default proceedings against Ayre. On March 8, 2023, Oppenheimer filed an opposition to the request for default proceedings against Ayre. On March 9, 2023, Claimant filed a reply in support of the request for default proceedings against Ayre. Ayre did not respond to the request. Claimant's claims proceeded against Ayre pursuant to Rule 12801 of the Code in FINRA Arbitration 23-00602.

The Award in this matter may be executed in counterpart copies.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, and any post-hearing submissions, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. Claimant's claims are denied in their entirety.

2. Oppenheimer is liable for and shall pay to Claimant the sum of $300.00 to reimburse Claimant for the non-refundable portion of the filing fee previously paid to FINRA Dispute Resolution Services.

3. Any and all claims for relief not specifically addressed herein, including any requests for punitive damages and attorneys' fees, are denied.

## FEES

Pursuant to the Code, the following fees are assessed:

**Filing Fees**
FINRA Dispute Resolution Services assessed a filing fee* for each claim:

FINRA Dispute Resolution Services
Arbitration No.  20-04139
Award Page 4 of 6

| | | |
|---|---|---|
| Initial Claim Filing Fee | =$ | 1,425.00 |

*The filing fee is made up of a non-refundable and a refundable portion.

## Member Fees
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm that employed the associated person at the time of the event giving rise to the dispute. Accordingly, as parties, Respondents Oppenheimer and Pershing are each assessed the following:

Oppenheimer:

| | | |
|---|---|---|
| Member Surcharge | =$ | 1,900.00 |
| Member Process Fee | =$ | 3,750.00 |

Pershing:

| | | |
|---|---|---|
| Member Surcharge | =$ | 1,900.00 |
| Member Process Fee | =$ | 3,750.00 |

## Postponement Fees
Postponements granted during these proceedings for which fees were assessed or waived:

| | | |
|---|---|---|
| February 8-11, 2022, postponement requested by Claimant | =$ | 1,125.00 |
| June 1-3, 2022, postponement requested by Claimant | =$ | 1,125.00 |
| December 7-9, 2022 postponement requested by Claimant | =$ | 1,125.00 |
| **Total Postponement Fees** | =$ | 3,375.00 |

The Panel has assessed $2,250.00 of the postponement fees to Claimant.

The Panel has waived $1,125.00 of the postponement fees.

## Last-Minute Cancellation Fees
Fees apply when a hearing on the merits is cancelled within ten calendar days before the start of a scheduled hearing session:

| | | |
|---|---|---|
| December 7-9, 2022, cancellation requested by Claimant | =$ | WAIVED |

## Discovery-Related Motion Fees
Fees apply for each decision rendered on a discovery-related motion.

| | | |
|---|---|---|
| One (1) decision on a discovery-related motion on the papers with the Panel @ $600.00/decision | =$ | 600.00 |

Respondents submitted One (1) discovery-related motion

| | | |
|---|---|---|
| **Total Discovery-Related Motion Fees** | =$ | 600.00 |

FINRA Dispute Resolution Services
Arbitration No. 20-04139
Award Page 5 of 6

The Panel has assessed the total discovery-related motion fees to Oppenheimer.

## Hearing Session Fees and Assessments

The Panel has assessed hearing session fees for each session conducted. A session is any meeting between the parties and the Arbitrator(s), including a pre-hearing conference with the Arbitrator(s), which lasts four (4) hours or less. Fees associated with these proceedings are:

| | | | | |
|---|---|---|---|---|
| One (1) pre-hearing session with a single Arbitrator @ $450.00/session | | | =$ | 450.00 |
| Pre-Hearing Conference:   December 17, 2021 | 1 session | | | |
| | | | | |
| Two (2) pre-hearing sessions with the Panel @ $1,125.00/session | | | =$ | 2,250.00 |
| Pre-Hearing Conferences: April 27, 2021 | 1 session | | | |
| | December 5, 2022 | 1 session | | |
| | | | | |
| Five (5) hearing sessions @ $1,125.00/session | | | =$ | 5,625.00 |
| Hearings: | March 14, 2023 | 3 sessions | | |
| | March 15, 2023 | 2 sessions | | |

| | | |
|---|---|---|
| **Total Hearing Session Fees** | =$ | 8,325.00 |

The Panel has assessed $1,068.75 the hearing session fees to Claimant.

The Panel has assessed $787.50 of the hearing session fees jointly and severally to Respondents Oppenheimer, Pershing and Ayre.

The Panel has assessed $6,468.75 of the hearing session fees to Oppenheimer.

All balances are payable to FINRA Dispute Resolution Services and are due upon receipt.

FINRA Dispute Resolution Services
Arbitration No.  20-04139
Award Page 6 of 6

## ARBITRATION PANEL

| Thomas E Shuck | - | Non-Public Arbitrator, Presiding Chairperson |
| Frank Cronin | - | Public Arbitrator |
| Judy Man-Ling Lam | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

## Concurring Arbitrators' Signatures

*Thomas E Shuck*
_____
Thomas E Shuck
Non-Public Arbitrator, Presiding Chairperson

04/07/2023
_____
Signature Date

*Frank Cronin*
_____
Frank Cronin
Public Arbitrator

04/05/2023
_____
Signature Date

*Judy Man-Ling Lam*
_____
Judy Man-Ling Lam
Non-Public Arbitrator

04/06/2023
_____
Signature Date

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

April 07, 2023
_____
Date of Service (For FINRA Dispute Resolution Services use only)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 2

**OBJECTION TO MOTION FOR SUMMARY JUDGEMENT**

**Award**
**FINRA Dispute Resolution Services**

In the Matter of the Arbitration Between:

Claimant
Susan Shapiro Cowan

Case Number: 23-00602

vs.

Respondent
Dennis Phillip Ayre

Hearing Site: Los Angeles, California

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

Nature of the Dispute: Customer vs. Associated Person

This matter proceeded pursuant to Rule 12801 of the Code of Arbitration Procedure ("Code").

### REPRESENTATION OF PARTIES

For Claimant Susan Shapiro Cowan: Daniel R. Gutenplan, Esq., Enenstein Pham & Glass LLP, Costa Mesa, California.

Respondent Dennis Phillip Ayre did not appear.

### CASE INFORMATION

Statement of Claim filed on or about: December 21, 2020.
Claimant did not sign the Submission Agreement.

Respondent did not file a Statement of Answer or sign the Submission Agreement.

### CASE SUMMARY

In the Statement of Claim, Claimant asserted the following causes of action: breach of fiduciary duties and negligence. The causes of action relate to Foresight Energy LP ("FELP") stock.

### RELIEF REQUESTED

In the Statement of Claim, Claimant requested:

1.  Substantial damages in an amount in excess of $300,000.00;
2.  Punitive and exemplary damages as allowed by law, to include California Code of Civil

Procedure § 3294, in an amount sufficient to punish and make an example of
Respondent;

3. Costs;
4. Attorneys' fees;
5. Pre and post judgment interest; and
6. Such other and further relief as the Panel may deem just and proper.

## OTHER ISSUES CONSIDERED AND DECIDED

The Arbitrator acknowledges having read the pleadings and other materials filed by the parties.

Respondent did not file a Statement of Answer or properly executed Submission Agreement but
is required to submit to arbitration pursuant to the Code and is bound by the determination of the
Arbitrator on all issues submitted.

Claimant's claims against Respondent were originally brought in FINRA Arbitration Case 20-
04139 ("Original Case"). On March 6, 2023, Claimant opted to proceed against Respondent
pursuant to Rule 12801 of the Code. The claims against Respondent were therefore bifurcated
from the Original Case.

The Arbitrator determined that Respondent was served with the Claim Notification letter dated
December 31, 2020 by FedEx mail, as evidenced by the tracking information available online,
and the Overdue Notice (including the Statement of Claim) dated February 22, 2021 by FedEx
mail, as evidenced by the tracking information available online. The Arbitrator also determined
that Respondent was served with the Notification of Panel dated March 22, 2021 by FedEx mail,
as evidenced by the tracking information available online.

On May 20, 2022, Respondent registered for the DR Portal in the Original Case, providing
Respondent Ayre with access to all documents filed in the case, including the Statement of
Claim, Overdue Notice, and Notification of Panel.

The Arbitrator determined that Respondent is therefore, bound by the Arbitrator's ruling and
determination.

## AWARD

After considering the pleadings, the Arbitrator has decided and determined in full and final
resolution of the issues submitted for determination as follows:

1. Respondent is liable for and shall pay to Claimant the sum of $322,648.35 in compensatory
   damages.

2. Any and all claims for relief not specifically addressed herein, including any requests for
   punitive damages and attorneys' fees, are denied.

## FEES

Decision on the papers:                                                    =$      300.00

FINRA Dispute Resolution Services
Arbitration No.  23-00602
<u>Award Page 3 of 4</u>

---

Total Hearing Session Fees                                        =$        300.00

The Arbitrator has assessed the total hearing session fees to Respondent.

All balances are payable to FINRA Dispute Resolution Services and are due upon receipt.

FINRA Dispute Resolution Services
Arbitration No.  23-00602
<u>Award Page 4 of 4</u>

## <u>ARBITRATOR</u>

Thomas E Shuck              -         Sole Non-Public Arbitrator

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

## <u>Arbitrator's Signature</u>

*__Thomas E Shuck__*                          __04/06/2023__
Thomas E Shuck                              Signature Date
Sole Non-Public Arbitrator

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

April 07, 2023
Date of Service (For FINRA Dispute Resolution Services use only)

1

# EXHIBIT 3

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**OBJECTION TO MOTION FOR SUMMARY JUDGEMENT**

 Transacts Business All Principal Exchanges 

85 Broad Street • New York NY 10004 • (212) 668-8000

REDACTED

# Account Information
**7182**

## Personal Information

| Branch Office | Account Number | FA No. | SSN or Tax ID | Account Class |
|---|---|---|---|---|
| G58 | 7182 | 65Y | | Individual |

| Account Type | ☐ Cash | ☒ Margin * | ☐ Managed † | ☐ Option * | ☐ Commodity | ☐ IRA | * Additional documents are required and will be forwarded |
|---|---|---|---|---|---|---|---|

| Short Name | | Date Opened | Date Updated |
|---|---|---|---|
| Cowan | | 09/04/14 | 09/04/14 |

| Legal Name (All Owners) / Company / Trust Name |
|---|
| Susan Shapiro Cowan |

| Mailing Address |
|---|
| 10711 Ashton Avenue |

| City | State | Zip | Country | DOB (UGMA-Minor's) | Date of Trust |
|---|---|---|---|---|---|
| Los Angeles | CA | 90024 | US | 06/05/1959 | |

| Home Phone | Mobile Phone | Business Phone | Email Address |
|---|---|---|---|
| 818-929-8984 | 818-929-8984 | | battyray@aol.com |

| Legal Permanent Address |
|---|
| 10711 Ashton Avenue   Los Angeles, CA 90024  US |

| Special Mailing or Other Instructions | Duplicate Mail For:   Confirms ☐   Statements ☐   To: |
|---|---|

## Employment

| Employer's Name (If Retired - Indicate Former Occupation and Employer) | Retired | Years Employed |
|---|---|---|
| Vista Del Mar | ○ Yes  ⦿ No | 07 |

| Nature of Business | Occupation | Estimated Annual Compensation |
|---|---|---|
| Social Services | Parent Partner Lead | 37000 |

| Street Address |
|---|
| 3200 Motor Avenue |

| City | State | Zip Code | Country |
|---|---|---|---|
| Los Angeles | CA | 90034 | US |

## Spouse / Other Joint Tenant / Multiple Trustee

| Name |
|---|
| |

| Address |
|---|
| |

| Employer | SSN / Tax ID | DOB |
|---|---|---|
| | | |

| U.S. Citizen | Retired | Occupation | Est. Annual Compensation |
|---|---|---|---|
| ○ Yes  ○ No | ○ Yes  ○ No | | |

## Other Accounts, Investments and Insurance

| Bank Name | City | State |
|---|---|---|
| Chase | Sherman Oaks | CA |

| Account Type | ☒ Checking | ☒ Savings | Insurance and Annuities | ☐ Annuities | ☐ Life Insurance |
|---|---|---|---|---|---|

| Account(s) With Other Brokerage Firm(s)   ☒ No Other Firms |
|---|
| (1) Name | Value |
| (2) Name | Value |
| (3) Name | Value |

## General Information

**Investment Objectives and Risk Tolerance**

- [ ] Liquidity (Cash Equivalents)
- [ ] Current Income (Conservative)
- [ ] Current Income (Moderate)
- [ ] Current Income (Aggressive)
- [ ] Speculation (Significant Risk)
- [ ] Tax Free / Deferral
- [x] Capital Appreciation (Conservative)
- [ ] Capital Appreciation (Moderate)
- [ ] Capital Appreciation (Aggressive)
- [ ] Short Term Trading (Significant Risk)

**Investment Experience (Indicates number of years)**

| | | | |
|---|---|---|---|
| [x] Equities — 01 | [ ] Options | [x] Municipals — 01 | |
| [ ] Mutual Funds | [ ] Corporate Debt | [ ] Commodities/Futures | |
| [ ] IPOs | [ ] Restricted Stocks | [ ] Managed Money | |
| [ ] U.S. Treasury | [ ] Private Placements | [ ] High Yield Debt | |
| [ ] Other | | | |

**Liquidity Needs** ○ Very Important   ○ Important   ● Somewhat Important   ○ Not Important

**Time Horizon** ○ Under 1 Year   ○ 1-2 Years   ○ 3-5 Years   ● 6-10 Years   ○ 11-20 Years   ○ Over 20 Years

**U.S. Citizen** ● Yes  ○ No    If not, specify Country of Citizenship

**Marital Status** ○ Married  ○ Single  ● Divorced  ○ Widowed    **No. of Dependents** 0

Is client now or has ever been a corporate officer, director or client own 10% of corporation stock?   ○ Yes  ● No    If Yes, Specify Corporation

Is client an employee of Oppenheimer & Co. Inc. or related to an employee?   ○ Yes  ● No    Does client or spouse have another account with us?   ○ Yes  ● No    If Yes, Specify Account

| Annual Income (Approx; All Sources) | Liquid Net Worth (Excl Home, Auto, etc.) | Total Net Worth (Approx) | Estimated Tax Bracket (%) |
|---|---|---|---|
| 37000 | 350000 | 400000 | 15 |

Approximate Net Worth of Entities and Non-Natural Persons $            Investable Assets of Entity $

**Original Source of Funds / Assets for Investing (Check all those that apply)**

- [ ] Employment/Payroll
- [ ] Gift
- [ ] Pension/Retirement Funds
- [ ] Inheritance
- [ ] Operating Business
- [ ] Divorce or Other Legal Settlement
- [x] Sale of Assets (Other than Securities)
- [ ] Other
- [ ] Loan(s)

Is client (or partner, if partnership) associated with or employed by any security firm, stock exchange, insurance company, bank, investment company and/or investment advisor? If Yes, specify name of individual, firm and position:   ○ Yes  ● No

Name:                                           Position:

If account is other than an individual, indicate person authorized to place orders and issue instructions:

Name:                                           Position:

Written authorization must be obtained

**How was account acquired?**
○ Walk In/Phone   ○ Prospect (Prior Contact)   ○ Advertising   ○ Known Personally   ○ Referral - Non Client    If Referral - Non Client, Specify

● Referral Client    If Referral Client, Specify **Michael Marks**    ○ Other    If Other, Specify

**Initial Transaction** ● Buy  ○ Sell  ○ Other    If Other, Specify    **Initial Transaction Status**

## Trading Authorization

Orders Received from (Name of agent or investment advisor)

Address

**Power of Attorney** ○ Limited  ○ Full  ○ Legal  ○ Other    If Other, Specify    Relationship    Telephone

**Written Authorization Obtained** ○ Yes  ○ No    Is agent employed by Oppenheimer & Co. Inc.?  ○ Yes  ○ No

## Standing Instructions

**Income Distribution** ● Hold in Account  ○ Mail Check - Weekly  ○ Mail Check - Monthly  ○ Mail Check - Quarterly  ○ Journal Pay    **Dividend Reinvestment** ○ Yes  ● No

**Automatic Reinvestment (Sweep Account)** ○ Yes  ● No   If Yes, Specify **Advantage Bank Deposit Program**    Related Name (for Mutual Fund Breakpoint) **Cowan**

**Proceeds** ● Hold  ○ Mail   To

**Transfer Instructions** ● Hold in Account (Street Name)  ○ Customer Name & Ship (A)    Is Financial Advisor registered in state which client resides? ● Yes  ○ No

| Financial Advisor Approval | Date | Branch Manager Approval | Date |
|---|---|---|---|
| *Dennis Phillip Ayre* | 09/04/14 | *Casey Cassity* | 09/04/14 |

# OPPENHEIMER

# CLIENT AGREEMENT

FOR USE BY INDIVIDUAL; JOINT; SOLE PROPRIETOR;
NON-CORPORATE TRUST AND ESTATE ACCOUNTS

**Please read carefully, sign and return FIRM COPY**
To: Oppenheimer & Co. Inc.
    85 Broad Street
    New York, NY 10004

In consideration of Oppenheimer & Co. Inc. ("Oppenheimer") opening or maintaining one or more accounts (each an "Account") for the undersigned (the "Client"), the Client agrees to the terms and conditions contained in this Agreement. The heading of each provision of this Agreement is for descriptive purposes only and shall not be deemed to modify or qualify any of the rights or obligations set forth in each such provision. For purposes of this Agreement, "securities and other property" means, but is not limited to, money, securities, deposits at a bank or other depository institution, financial instruments and commodities of every kind and nature and related contracts and options, except that the provisions of Paragraphs 32 and 33 herein (the arbitration clauses) shall not apply to commodities accounts. This definition includes securities or other property currently or hereafter held, carried or maintained by the Client for any purpose, in and for any of the Accounts now or hereafter opened, including any account in which the Client may have an interest and all other property usually and customarily dealt in by brokerage firms, benefits, claims, demands, rights and entitlements arising therefrom or attaching thereto, and all proceeds and distributions thereof.

**1. APPLICABLE RULES AND REGULATIONS.** This Agreement and its enforcement shall be governed by and construed in accordance with the laws of the State of New York without giving effect to the choice of law or conflicts of law provisions thereof. All transactions for Client's Account shall be subject to the regulations of all applicable federal, state and self-regulatory agencies, including, but not limited to, the U.S. Securities and Exchange Commission, the various securities and commodity exchanges, the Municipal Securities Rulemaking Board, the Financial Industry Regulatory Authority ("FINRA"), the Board of Governors of the Federal Reserve System, and the constitution, rules and customs of the exchange or market (and its clearing house, if any) where executed. Client agrees not to exceed the exercise limits and/or position limits set by the option exchanges, for Client's own Account, whether acting alone or in concert with others.

**2. ENTIRE UNDERSTANDING AND ASSIGNMENT.** This Agreement contains the entire understanding between the Client and Oppenheimer concerning the subject matter of this Agreement and supersedes any and all prior agreements between the parties concerning the subject matter herein. Client may not assign the rights and obligations hereunder without first obtaining the prior written consent of Oppenheimer.

**3. SEVERABILITY.** If any provision of this Agreement is held to be invalid, void or unenforceable by reason of any law, rule, administrative order or judicial decision, that determination shall not affect the validity of the remaining provisions of this Agreement.

**4. WAIVER.** Except as specifically permitted in this Agreement, no provision of this Agreement can be, nor be deemed to be, waived, altered, modified or amended unless such is agreed to in a writing signed by Oppenheimer and any failure by Oppenheimer to insist at any time upon strict compliance with this Agreement or with any of its terms shall not constitute or be considered a waiver by Oppenheimer of any of its rights.

**5. DELIVERY OF SECURITIES.** Without abrogating any of Oppenheimer's rights under any other portion of this Agreement and subject to any indebtedness of the Client to Oppenheimer, the Client may demand to receive physical delivery of fully-paid securities in his/her account. If physical certificates are not available, such security positions will be electronically transferred to an account in the Client's name at the applicable transfer agent. Oppenheimer may, but shall not be obligated to, charge the Client for such activities.

**6. LIENS.** All securities and other property of the Client in any account in which the Client has an interest shall be subject to a lien for the discharge of any and all indebtedness or any other obligation of the Client to Oppenheimer. All securities and other property of the Client shall be held by Oppenheimer as security for the payment of any such obligations or indebtedness to Oppenheimer in any Account that the Client may have an interest, and Oppenheimer subject to applicable law may, at any time and without prior notice to the Client, use and/or transfer any or all securities and other property interchangeably in any Account(s) in which the Client has an interest. In enforcing such lien or security interest, Oppenheimer shall have the discretion to determine which property is to be sold and the order in which it is to be sold and shall have, in addition to all other rights and remedies available to it, all the rights and remedies available to a secured party under the New York Uniform Commercial Code, in effect from time to time.

**7. PLEDGE OF SECURITIES AND OTHER PROPERTY.** Within the limitations imposed by applicable laws, rules and regulations, all securities and other property of the Client may be pledged and repledged and hypothecated and rehypothecated by Oppenheimer from time to time, without notice to the Client, either separately or in common with such other securities and other property of other bona fide Clients of Oppenheimer, for any amount due to Oppenheimer in the Client's Account(s). Oppenheimer may do so without retaining in its possession, or under its control for delivery, a like amount of similar securities or other property. The Client's ability to exercise certain attendant rights of ownership with respect to such pledged or hypothecated securities, including, without limitation, the exercise of any voting rights, may be limited. Additionally, Client will be at risk of losing Client's qualified dividend status and consequently, any preferential tax rates on dividends.

**8. INTEREST.** Debit balances of the Account(s) of the Client shall be charged with interest in accordance with Oppenheimer's established custom, as disclosed to the Client pursuant to the provisions of Rule 10b-16 of the Securities Exchange Act of 1934. Attached to Client's copy of this agreement is the Disclosure Statement, which the Client should read and retain. By signing this Agreement, Client acknowledges that it has read the Disclosure Statement and understands the type, amount and manner of interest that will be charged on all debit balances.

**9. MARGIN.** When the Client purchases securities, the Client may pay for the securities in full or, in Oppenheimer's discretion, borrow from Oppenheimer part of the purchase price. If the Client chooses to borrow funds from Oppenheimer, the Client will need to open a margin account. The securities purchased are Oppenheimer's collateral for its loan of funds to the Client. If the securities in the Client's account decline in value, so does the value of the collateral supporting the loan, and as a result, Oppenheimer can, and sometimes must, take action, such as issue a margin call and/or sell securities or other assets in any of the Client's accounts held at Oppenheimer in order to maintain the required equity in the account relative to the value of the account and the amount borrowed. The Client agrees to maintain in all accounts with Oppenheimer such positions and margins as required by all applicable statutes, rules, regulations, procedures and custom, or as Oppenheimer deems necessary or advisable. The Client further agrees to promptly satisfy all margin and maintenance calls. It is the general policy of Oppenheimer to require margin Clients to maintain at least a 35% margin, although a higher margin percentage applies for certain securities (including stocks and corporate bonds trading at or below a specified price as determined from time to time by Oppenheimer, and put or call options), and a lower margin percentage applies for certain other securities (including Government and municipal securities and corporate bonds trading at or above a specified price as determined from time to time by Oppenheimer). Oppenheimer always reserves the right to require additional margin any time it deems this desirable. Margin calls can be satisfied by the deposit of additional securities and/or funds.

OPPENHEIMER

**10. MARGIN RISK DISCLOSURES. IT IS POSSIBLE TO LOSE MORE FUNDS THAN ARE DEPOSITED IN A MARGIN ACCOUNT.** A DECLINE IN THE VALUE OF SECURITIES THAT ARE PURCHASED IN THE CLIENT'S MARGIN ACCOUNT MAY REQUIRE THAT THE CLIENT DEPOSIT ADDITIONAL FUNDS INTO THE CLIENT'S MARGIN ACCOUNT IN ORDER TO AVOID THE FORCED SALE OF THOSE SECURITIES OR OTHER SECURITIES OR ASSETS IN THE CLIENT'S ACCOUNT. ALTHOUGH OPPENHEIMER MAY, IN CERTAIN LIMITED CIRCUMSTANCES, GRANT AN EXTENTION OF TIME TO MEET MARGIN REQUIREMENTS, THE CLIENT IS NOT ENTITLED TO ANY EXTENSION OF TIME AND UNDERSTANDS THAT IT DOES NOT HAVE ANY RIGHT TO SAME.

**11. DISCLOSURES REGARDING LIQUIDATIONS AND COVERING POSITIONS.** THE CLIENT SHOULD CLEARLY UNDERSTAND THAT, NOTWITHSTANDING A GENERAL POLICY OF GIVING CLIENTS NOTICE OF A MARGIN DEFICIENCY, OPPENHEIMER IS NOT OBLIGATED TO REQUEST ADDITIONAL MARGIN FROM THE CLIENT IN THE EVENT THE CLIENT'S ACCOUNT FALLS BELOW MINIMUM MAINTENANCE REQUIREMENTS. MORE IMPORTANTLY, THERE MAY/WILL BE CIRCUMSTANCES WHERE OPPENHEIMER WILL LIQUIDATE SECURITIES AND/OR OTHER PROPERTY IN ANY OF THE CLIENT'S ACCOUNTS, IN ITS DISCRETION AND WITHOUT NOTICE TO THE CLIENT, TO ENSURE THAT MINIMUM MAINTENANCE REQUIREMENTS ARE SATISFIED. THE CLIENT WILL BE RESPONSIBLE FOR ANY DEBIT IN THE ACCOUNT AFTER A SALE TO MEET THE MINIMUM MAINTENANCE REQUIREMENTS. FURTHER, THE CLIENT UNDERSTANDS THAT THE CLIENT IS NOT ENTITLED TO CHOOSE WHICH SECURITIES OR ASSETS ARE LIQUIDATED OR SOLD TO MEET A MARGIN CALL.

**12. LIQUIDATIONS AND COVERING POSITIONS.** OPPENHEIMER SHALL HAVE THE RIGHT, IN ACCORDANCE WITH ITS GENERAL POLICIES REGARDING MARGIN MAINTENANCE REQUIREMENTS, WHICH ARE SUBJECT TO CHANGE IN ITS DISCRETION WITHOUT NOTICE TO CLIENT, TO: [1:] REQUIRE ADDITIONAL COLLATERAL OR [2:] TO LIQUIDATE ANY SECURITIES AND OTHER PROPERTY WHENEVER, IN OPPENHEIMER'S DISCRETION, OPPENHEIMER CONSIDERS IT NECESSARY FOR ITS PROTECTION INCLUDING, BUT NOT LIMITED TO: THE FAILURE OF THE CLIENT TO PROMPTLY MEET ANY CALL FOR ADDITIONAL COLLATERAL; THE FILING OF A PETITION IN BANKRUPTCY BY OR AGAINST THE CLIENT; THE APPOINTMENT OF A RECEIVER IS FILED BY OR AGAINST CLIENT; AN ATTACHMENT IS LEVIED AGAINST ANY ACCOUNT OF THE CLIENT OR IN WHICH THE CLIENT HAS AN INTEREST; OR THE CLIENT'S DEATH. IN SUCH EVENT, OPPENHEIMER IS AUTHORIZED TO SELL ANY AND ALL SECURITIES AND OTHER PROPERTY IN ANY ACCOUNT OF THE CLIENT, WHETHER CARRIED INDIVIDUALLY OR JOINTLY WITH OTHERS, TO BUY ALL SECURITIES OR OTHER PROPERTY WHICH MAY BE SHORT IN SUCH ACCOUNT(S), TO CANCEL ANY OPEN ORDERS AND TO CLOSE ANY OR ALL OUTSTANDING CONTRACTS, ALL WITHOUT DEMAND FOR MARGIN OR ADDITIONAL MARGIN, OTHER NOTICE OF SALE OR PURCHASE, OR OTHER NOTICE OR ADVERTISEMENT, EACH OF WHICH IS EXPRESSLY WAIVED BY THE CLIENT. ANY SUCH SALES OR PURCHASES MAY BE MADE AT OPPENHEIMER'S DISCRETION ON ANY EXCHANGE OR OTHER MARKET WHERE SUCH BUSINESS IS USUALLY TRANSACTED OR AT PUBLIC AUCTION OR PRIVATE SALE, AND OPPENHEIMER MAY BE THE PURCHASER FOR OPPENHEIMER'S OWN ACCOUNT. IT IS UNDERSTOOD THAT A PRIOR DEMAND OR CALL, OR PRIOR NOTICE OF THE TIME AND PLACE OF SUCH SALE OR PURCHASE, SHALL NOT BE CONSIDERED A WAIVER OF OPPENHEIMER'S RIGHT TO SELL OR BUY WITHOUT DEMAND OR NOTICE AS HEREIN PROVIDED.

**13. SATISFACTION OF INDEBTEDNESS.** The Client agrees to satisfy, upon demand, any indebtedness, and to pay any debit balance remaining when the Client's Account is closed. Client Account(s) may not be closed without Oppenheimer first receiving all securities and other property for which the Account is short and all funds to pay in full for all securities and other property in which the Account(s) are long, including any interest charges accrued thereon.

**14. TRANSACTIONS AND SETTLEMENTS.** All orders for the purchase or sale of securities and other property will be authorized by the Client and executed with the understanding that an actual purchase or sale is intended and that it is the Client's intention and obligation in every case to deliver certificates or commodities to cover any and all sales or to pay for any purchase upon Oppenheimer's demand. If Oppenheimer makes a short sale of any securities and other property at the Client's direction or if the Client fails to deliver to Oppenheimer any securities and other property that Oppenheimer has sold at the Client's direction, Oppenheimer is authorized to borrow the securities and other property necessary to enable Oppenheimer to make delivery and the Client agrees to be responsible for any cost or loss Oppenheimer may incur, or the cost of obtaining the securities and other property if Oppenheimer is unable to borrow it. Oppenheimer is the Client's agent to complete all such transactions and is authorized to make advances and expend monies as are required.

**15. SALES BY CLIENT.** The Client understands and agrees that any order to sell "short" will be designated as such by the Client, and that Oppenheimer will mark the order as "short". A "short" sale means any sale of a security not owned by the seller or any sale that is consummated by delivery of a borrowed security. The Client agrees that all other sell orders will be for securities owned ("long"), at that time, by the Client. The designation on a sale order as "long" is a representation by the Client that the Client owns the security. By placing the order the Client affirms that he/she will deliver the securities on or before the settlement date. In the event of non-delivery, the Client agrees to settlement as described in Paragraph 14.

**16. RESTRICTIONS ON TRADING.** The Client understands that Oppenheimer may, in its sole discretion, prohibit or restrict trading of securities or substitution of securities in any of the Client's Account(s).

**17. ORAL AUTHORIZATIONS.** The Client agrees that Oppenheimer shall incur no liability in acting upon any oral instructions given to Oppenheimer concerning the Client's Account(s), provided such instructions reasonably appear to be genuine.

**18. CREDIT INFORMATION AND INVESTIGATION.** The Client authorizes Oppenheimer to obtain reports concerning the Client's credit standing and business conduct at Oppenheimer's discretion. Upon the Client's request, Oppenheimer will inform the Client whether it has obtained credit reports, and if it has, Oppenheimer will inform the Client of the name and address of the consumer reporting agency that furnished the reports to Oppenheimer.

**19. OPPENHEIMER AS AGENT.** The Client understands that Oppenheimer is acting as the Client's agent, unless Oppenheimer notifies the Client in writing before the settlement date for the transactions that Oppenheimer is acting as a dealer for its own account or as agent for some other person.

**20. FEES.** The Client understands that it may be subject to certain fees associated with the maintenance of the Client's Account(s). By signing this Agreement, the Client acknowledges that it has received, read and understands the Disclosure Statement accompanying this Agreement.



**21. TEMPORARY INVESTMENT OF FREE CREDIT BALANCES; PRINCIPAL AND INTEREST PAYMENTS.** Client authorizes, but does not require, Oppenheimer to automatically invest on a periodic basis the free credit balances in Client's Account ("Sweep Transactions"), including interest and dividends paid to Client, in mutually selected money market funds or deposit accounts at certain banks or other depository institutions at which Oppenheimer maintains an omnibus account in the name of Oppenheimer as agent for its clients ("Advantage Bank Deposit Program"), or in the absence of an oral or written selection by Client, in either pre-selected money market funds or the Advantage Bank Deposit Program ("Cash Investment Options"). Client understands that Oppenheimer may terminate Client's automatic cash investment account if Client's Account becomes inactive for a period of 90 days and/or if the credit balance falls below a stated minimum balance. Oppenheimer is not required to remit interest or dividends to Client on a daily basis. Oppenheimer may redeem money market shares, or withdraw the amounts invested in the Advantage Bank Deposit Program, without notice, to the extent necessary to satisfy any debits arising in Client's Account. Client acknowledges that interest will not be paid to Client on credit balances in Client's Account unless specifically agreed to by Oppenheimer. Oppenheimer may credit Client's Account with principal and interest due on debt securities held in Client's Account on the payment dates, but Oppenheimer is entitled to recover any such payments from Client if the same are not actually received by Oppenheimer from the trustee or paying agent.

All Sweep Transactions between Client's Account and the Advantage Bank Deposit Program, if designated as Client's Cash Investment Option, will appear on Client's periodic Account statements. The statements are provided in lieu of separate confirmations of those transactions. Information about the Advantage Bank Deposit Program that is available as a Cash Investment Option in connection with the cash Sweep Transactions, including the terms and conditions, interest rates, restrictions, and fees, is contained in the Terms and Conditions of the Advantage Bank Deposit Program and Disclosure Statement that are supplements to this Agreement. Client should read these documents carefully.

Oppenheimer may change the Cash Investment Option associated with Client's Account from time to time, or the terms of the Cash Investment Options, by providing at least 30 days' prior written notice to Client. By maintaining the Client's Account without written objection to Oppenheimer of Client's objection within the time period and at the address specified in the notice of change, Client shall be deemed to have consented to the change in the Cash Investment Option associated with Client's Account or to a change in the terms of the Cash Investment Option.

**22. CONFIRMATIONS AND STATEMENTS.** Confirmations of transactions and statements for the Client's Account(s) shall be binding upon the Client if the Client does not object, in writing, within 30 days after receipt by the Client. Notice or other communications, including margin and maintenance calls, delivered or mailed to the address provided by Client and listed on Client's New Account Form shall, until Oppenheimer has received notice in writing of a different address, be deemed to have been personally delivered to the Client whether actually received or not.

**23. CORRESPONDENT ACCOUNTS.** If any of the Client's Account(s) have been introduced to Oppenheimer and are carried by Oppenheimer only as a clearing broker, Client agrees that Oppenheimer is not responsible for the conduct of the introducing broker, and Oppenheimer's only responsibilities to Client relate to the execution, clearing and bookkeeping of transactions for the Client's Account(s). Furthermore, Client agrees that the introducing broker and its employees are third party beneficiaries of this Agreement.

**24. SUCCESSORS.** Client hereby agrees that this Agreement and all the terms thereof shall be binding upon Client's heirs, executors, administrators, successors, personal representatives, conservators and assigns ("Successors"). In the event of the Client's death, incompetency or disability, whether or not any Successors of the Client's estate and property shall have qualified or been appointed, Oppenheimer may continue to operate as though the Client were alive and competent and may liquidate the Client's account as described herein without prior notice or demand upon the Client's Successors. This Agreement shall inure to the benefit of Oppenheimer's present organization, and any successor organization or assigns, irrespective of any change or changes at any time in the personnel thereof, for any cause whatsoever, and the Client's Account(s) may be transferred to any such successors or assigns.

**25. CAPACITY TO CONTRACT, CLIENT AFFILIATION.** By signing below, the Client represents that he/she is of legal age, and that he/she is not an employee of any exchange, any corporation of which any exchange owns a majority of the capital stock, a member of any exchange, a member firm or member corporation registered on any exchange, a bank, trust company, insurance company or of any corporation, firm or individual engaged in the business of dealing, either as broker or as principal, in securities, bills of exchange, acceptances or other forms of commercial paper. Further, the Client will promptly notify Oppenheimer in writing to the extent that the foregoing is no longer true. The Client also represents that no one except the Client has an interest in the account or accounts of the Client with Oppenheimer.

**26. PRIVACY DISCLOSURE.** By signing this Agreement, Client acknowledges having received Oppenheimer's Privacy Disclosure and further, that Client has read and understood it.

**27. SIPC COVERAGE AND FDIC INSURANCE.** Cash and securities held by Oppenheimer in Client's Account are protected through Oppenheimer's membership in the Securities Investor Protection Corporation ("SIPC") up to an amount of $500,000, including up to $250,000 in cash. Oppenheimer supplements this protection for the remainder of cash and securities in Client's Account for a combined protection in the amount of $100,000,000. Client balances held in bank deposits available as a Cash Investment Option are not covered by SIPC. Information about SIPC may be found at www.sipc.org or by calling (202) 371-8300. SIPC coverage protects brokerage customers against misappropriation or disappearance of cash or securities in a customer's account at a broker-dealer firm during the bankruptcy of the broker-dealer, but does not protect against a decline in the value of securities or other assets. SPIC coverage is different from insurance coverage provided by the Federal Deposit Insurance Corporation ("FDIC"). FDIC insurance protects against the loss, to a certain maximum amount, of a customer's deposits if an FDIC-insured depository institution fails. Amounts in the Advantage Bank Deposit Program are not covered by SIPC. Rather, such amounts (including principal and accrued interest) held at the same depository institution per depositor for all accounts held in the same title and capacity are insured by the FDIC up to the Maximum Applicable Deposit Insurance amount permitted under federal law ($250,000 for individual and retirement accounts and $500,000 for joint accounts). More information about FDIC insurance is available at www.fdic.gov.

**28. TERMINATION.** Oppenheimer has the right to terminate any of Client's Account(s) (including multiple owner accounts) at any time by notice to Client. Furthermore, Oppenheimer reserves the right to reject or cancel any order and close any Account(s) in its reasonable discretion.

**29. AMENDMENT.** Oppenheimer may amend this Agreement at any time upon prior written notice to Client.



**30. NEW ACCOUNT APPLICATION.** The Client acknowledges that it has received and read Oppenheimer's New Account Application, and certifies that the information contained therein was provided by the Client to Oppenheimer and is true and accurate in all material respects. The Client agrees to notify the Oppenheimer office in which the Client is transacting business, without delay, of any changes or corrections in connection with any information contained in the New Account Application. This Paragraph is not applicable to correspondent accounts as described in Paragraph 23.

**31. JOINT ACCOUNTS.** If this is a joint account, Client jointly and severally agrees that each of the undersigned shall have the authority on behalf of Client's Account(s) to buy, sell (including short sales), and otherwise deal in, through Oppenheimer, securities and other property of all kinds, on margin or otherwise, to receive for the account and to dispose of money, securities and other property, make, terminate or modify for the Client Account(s) agreements relating to these matters or waive any of the provisions of such agreements, and generally to deal with each of the undersigned as if each alone were the Client Account(s) owner, all without notice to the other Client Account(s) owners. Each of the undersigned agrees that notice to any Client Account(s) owner shall be deemed to be notice to all Client Account(s) owners. Each Client Account(s) owner shall be jointly and severally liable for the Client Account(s).

Oppenheimer shall be entitled to follow the instructions of any of the undersigned concerning the Client Account(s) and make deliveries of any and all property in the Client Account(s), and make payments of any or all monies in the Client Account(s) as any of the undersigned may order and direct, even if such deliveries and/or payments shall be made to one of the undersigned personally, and not for the Client Account(s). Oppenheimer shall be under no obligation to inquire into the purpose of any such demand for delivery of property or payment, and Oppenheimer shall not be bound to see to the application or disposition of the said property and/or monies so delivered or paid pursuant to such instructions.

In the event of the death of any of the undersigned, the survivor(s) shall immediately give Oppenheimer written notice thereof, and Oppenheimer may, before or after receiving such notice, take such proceedings, require such documents, retain such portion and/or restrict transactions in the Client Account(s) as Oppenheimer may deem advisable to protect Oppenheimer against any tax, liability, penalty or loss under any present or future laws or otherwise. The estate of any of the undersigned who shall have died shall be liable and each survivor will be liable, jointly and severally, to Oppenheimer for any debt or loss in the Client Account(s) resulting from the completion of transactions initiated prior to Oppenheimer's receipt of a written notice of such death or incurred in the liquidation of the Client Account(s) or the adjustment of the interests of the respective parties.

Any taxes or other expenses becoming a lien against or being payable out of the Client Account(s) as the result of the death of any of the undersigned, or through the exercise by his or her estate or representatives of any rights in the Client Account(s), shall be chargeable against the interest of the survivor(s) as well as against the interest of the estate of the decedent. This provision shall not release the decedent's estate from any liability provided for in this Agreement.

| Office | Account Number | FA |
|--------|----------------|-----|
| | | |



If the Joint Account is owned as Tenants in Common, each tenant shall be considered to have an equal ownership interest in the account unless other percentages of ownership are designated below.

If Client intends to open a Joint Account, the type of Joint Account must be indicated below. **PLEASE NOTE THAT IF CLIENT DOES NOT INDICATE WHICH TYPE OF JOINT ACCOUNT BY CHECKING THE APPROPRIATE BOX, THE JOINT ACCOUNT WILL BE DESIGNATED AS JOINT TENANTS WITH RIGHTS OF SURVIVORSHIP.**

☐ The undersigned are Joint Tenants with Rights of Survivorship, so that in the case of death of any of the undersigned, the Client Account(s), in the entirety, becomes the property of the survivor or survivors and as so vested, shall be subject to the terms and conditions of this Agreement without in any manner releasing the decedent's estate from liability.

☐ The undersigned are Tenants-by-the-Entirety (for legally married persons only).

☐ The Undersigned are Tenants in Common, each of the undersigned having an undivided interest therein. In the event of the death of either or any of the undersigned, the interests in the Client Account(s) as of the close of business on the date of death of the decedent(s) (or on the next following business day if the date of death is not a business day), shall be vested as set forth below and shall continue to be subject to the terms and conditions of this Agreement, without in any manner releasing the decedent's estate from liability:

| | |
|---|---|
| Print Name of Owner | Percentage of Estate |

| | |
|---|---|
| Print Name of Owner | Percentage of Estate |

| | |
|---|---|
| Print Name of Owner | Percentage of Estate |

| | |
|---|---|
| Print Name of Owner | Percentage of Estate |

**32. ARBITRATION DISCLOSURES.**
THIS AGREEMENT CONTAINS A PREDISPUTE ARBITRATION CLAUSE. BY SIGNING AN ARBITRATION AGREEMENT THE PARTIES AGREE AS FOLLOWS:
A.  ALL PARTIES TO THIS AGREEMENT ARE GIVING UP THE RIGHT TO SUE EACH OTHER IN COURT, INCLUDING THE RIGHT TO A TRIAL BY JURY, EXCEPT AS PROVIDED BY THE RULES OF THE ARBITRATION FORUM IN WHICH A CLAIM IS FILED.
B.  ARBITRATION AWARDS ARE GENERALLY FINAL AND BINDING; A PARTY'S ABILITY TO HAVE A COURT REVERSE OR MODIFY AN ARBITRATION AWARD IS VERY LIMITED.
C.  THE ABILITY OF THE PARTIES TO OBTAIN DOCUMENTS, WITNESS STATEMENTS AND OTHER DISCOVERY IS GENERALLY MORE LIMITED IN ARBITRATION THAN IN COURT PROCEEDINGS.
D.  THE ARBITRATORS DO NOT HAVE TO EXPLAIN THE REASON(S) FOR THEIR AWARD UNLESS, IN AN ELIGIBLE CASE, A JOINT REQUEST FOR AN EXPLAINED DECISION HAS BEEN SUBMITTED BY ALL PARTIES TO THE PANEL AT LEAST 20 DAYS PRIOR TO THE FIRST SCHEDULED HEARING DATE.
E.  THE PANEL OF ARBITRATORS WILL TYPICALLY INCLUDE A MINORITY OF ARBITRATORS WHO WERE OR ARE AFFILIATED WITH THE SECURITIES INDUSTRY.
F.  THE RULES OF SOME ARBITRATION FORUMS MAY IMPOSE TIME LIMITS FOR BRINGING A CLAIM IN ARBITRATION. IN SOME CASES, A CLAIM THAT IS INELIGIBLE FOR ARBITRATION MAY BE BROUGHT IN COURT.
G.  THE RULES OF THE ARBITRATION FORUM IN WHICH THE CLAIM IS FILED, AND ANY AMENDMENTS THERETO, SHALL BE INCORPORATED INTO THIS AGREEMENT.

**33. AGREEMENT TO ARBITRATE ALL CONTROVERSIES. THE CLIENT AGREES, AND BY CARRYING AN ACCOUNT FOR THE CLIENT, OPPENHEIMER AGREES, THAT ALL CONTROVERSIES WHICH MAY ARISE BETWEEN THE CLIENT AND OPPENHEIMER AND ANY OF ITS OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR AFFILIATES RELATING TO, BUT NOT LIMITED TO, THOSE INVOLVING ANY TRANSACTION OR THE CONSTRUCTION, PERFORMANCE, OR BREACH OF THIS OR ANY OTHER AGREEMENT BETWEEN THE CLIENT AND OPPENHEIMER PERTAINING TO SECURITIES AND OTHER PROPERTY, WHETHER ENTERED INTO PRIOR, ON OR SUBSEQUENT TO THE DATE HEREOF, SHALL BE DETERMINED BY ARBITRATION. ANY ARBITRATION UNDER THIS AGREEMENT SHALL BE CONDUCTED PURSUANT TO THE FEDERAL ARBITRATION ACT AND THE LAWS OF THE STATE OF NEW YORK, BEFORE FINRA AND IN ACCORDANCE WITH ITS RULES THEN IN FORCE. THE AWARD OF THE ARBITRATORS, OR OF THE MAJORITY OF THEM, SHALL BE FINAL, AND JUDGMENT UPON THE AWARD RENDERED MAY BE ENTERED IN ANY COURT, STATE OR FEDERAL, HAVING JURISDICTION.**

NO PERSON SHALL BRING A PUTATIVE OR CERTIFIED CLASS ACTION TO ARBITRATION, NOR SEEK TO ENFORCE ANY PRE-DISPUTE ARBITRATION AGREEMENT AGAINST ANY PERSON WHO HAS INITIATED IN COURT A PUTATIVE CLASS ACTION; WHO IS A MEMBER OF A PUTATIVE CLASS WHO HAS NOT OPTED OUT OF THE CLASS WITH RESPECT TO ANY CLAIMS ENCOMPASSED BY THE PUTATIVE CLASS ACTION UNTIL: (i) THE CLASS CERTIFICATION IS DENIED, (ii) THE CLASS IS DECERTIFIED, OR (iii) THE CLIENT IS EXCLUDED FROM THE CLASS BY THE COURT. SUCH FORBEARANCE TO ENFORCE AN AGREEMENT TO ARBITRATE SHALL NOT CONSTITUTE A WAIVER OF ANY RIGHTS UNDER THIS AGREEMENT EXCEPT TO THE EXTENT STATED HEREIN.

**34. DISCLOSURES TO ISSUERS.** Under Rule 14b - 1 (c) of the Securities Exchange Act of 1934, we are required to disclose to an issuer the name, address, and securities position of our Clients who are beneficial owners of that issuer's securities unless the Client objects. Therefore, unless Client indicates below that Client objects to the disclosure of such information, Client will be deemed to have waived any such objection.

☐ Yes, I object to the disclosure of such information.

**35. DISCLOSURES TO AFFILIATED AND NONAFFILIATED THIRD PARTIES.** Under Regulation S-P, Oppenheimer is permitted to share personal information collected from Client in the course of its relationship with Client with affiliated and nonaffiliated parties under certain circumstances without Client's approval. If Client does not want his/her personal information shared outside of these permitted circumstances with nonaffiliated third parties without Client's prior notification, Client must indicate this preference by checking where indicated below.

☐ Yes, I object to the disclosure of such information.
Further information on the circumstances under which such disclosures may be made may be found in Oppenheimer's Privacy Disclosure accompanying this Agreement.



| Office | Account Number | FA |
|--------|----------------|-----|
|        | 7 1 8 2 6 5 Y  |    |

REDACTED



**36. EMPLOYER IDENTIFICATION NUMBER AND CERTIFICATION** -- Please refer to the accompanying instructions before completing.

Under penalties of perjury, Client hereby certifies that:

1. The number shown on this form is Client's correct Employer Identification Number ("EIN") (or Client is waiting for a number to be issued); and
2. Client is not subject to backup withholding because: (a) Client is exempt from backup withholding, or (b) Client has not been notified by the Internal Revenue Service (IRS) that Client is subject to backup withholding, as a result of a failure to report all interest or dividends, or (c) the IRS has notified Client that Client is no longer subject to backup withholding; and
3. Client is a U.S. entity (including a U.S. resident alien).
4. Client is exempt from FACTA reporting because this account is being opened and held within the United States.

**CERTIFICATION INSTRUCTIONS.** Client must cross out item 2 above if Client has been notified by the IRS that Client is currently subject to backup withholding because Client has failed to report all interest and dividends on Client's tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, Client is not required to sign the Certification, but Client must provide Client's correct EIN. (See enclosed Instructions)

**FOR THOSE EXEMPT FROM BACKUP WITHHOLDING (SEE ENCLOSED INSTRUCTIONS), PLEASE CHECK THE FOLLOWING BOX:**

☐ Client is exempt from backup withholding.

**THE ABOVE INSTRUCTIONS PERTAIN TO PRIMARILY THOSE CLIENTS WITH U.S. EINs. NON-U.S. PERSONS AND/OR THOSE WHO ARE NOT ELIGIBLE FOR U.S. EINs MUST COMPLETE ONE OF THE FORMS LISTED IN THE ENCLOSED INSTRUCTIONS. A W-8 FORM WILL BE PROVIDED AS NECESSARY.**

---

**IF OPENING AN INDIVIDUAL CASH ACCOUNT:**

BY SIGNING THIS AGREEMENT THE CLIENT ACKNOWLEDGES THAT CLIENT HAS RECEIVED A COPY OF THIS AGREEMENT AND HAS READ THIS AGREEMENT IN ITS ENTIRETY BEFORE SIGNING. THE CLIENT HAS ALSO RECEIVED AND READ THE DISCLOSURE STATEMENT, WHICH IS ATTACHED HERETO. THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AS SET FORTH IN PARAGRAPHS 32 AND 33 ON PAGE 5.

(X) _Susan S. Cowan_        8/30/14
Client Signature        Date

Client's TIN to be used by Oppenheimer is:

☐ Social Security Number or ☐ EIN

[■■■■■■■■■■■■■■■]

☑ Individual/Sole Proprietor  ☐ Trust/Estate

**IF OPENING A JOINT CASH ACCOUNT, PLEASE ENSURE THAT THE TYPE OF JOINT ACCOUNT INTENDED HAS BEEN INDICATED IN PARAGRAPH 31:**

(X) _____
Joint/Trustee Client Signature        Date

Joint/Trustee's TIN to be used by Oppenheimer is:

☐ Social Security Number or ☐ EIN

[ | | | | | | | | | | ]

☐ Joint ☐ Trust/Estate

(X) _____
Joint/Trustee Client Signature        Date

Joint/Trustee's TIN to be used by Oppenheimer is:

☐ Social Security Number or ☐ EIN

[ | | | | | | | | | | ]

☐ Joint/ ☐ Trust/Estate

---

**IF OPENING AN INDIVIDUAL MARGIN ACCOUNT:**

BY SIGNING THIS AGREEMENT THE CLIENT ACKNOWLEDGES THAT:

1. THE SECURITIES IN THE CLIENT'S MARGIN ACCOUNT ARE UNENCUMBERED, FREELY PLEDGABLE, AND MAY BE LOANED TO OPPENHEIMER OR LOANED OUT TO OTHERS; AND
2. THE CLIENT HAS RECEIVED A COPY OF THIS AGREEMENT AND HAS READ THIS AGREEMENT IN ITS ENTIRETY BEFORE SIGNING. THE CLIENT HAS ALSO RECEIVED AND READ THE DISCLOSURE STATEMENT, WHICH IS ATTACHED HERETO. THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AS SET FORTH HEREIN IN PARAGRAPHS 32 AND 33 ON PAGE 4.

(X) _____
Client Signature        Date

Client's TIN to be used by Oppenheimer is:

☐ Social Security Number or ☐ EIN

[ | | | | | | | | | | ]

☐ Individual/Sole Proprietor ☐ Trust/Estate

**IF OPENING A JOINT MARGIN ACCOUNT, PLEASE ENSURE THAT THE TYPE OF JOINT ACCOUNT INTENDED HAS BEEN INDICATED IN PARAGRAPH 31:**

(X) _____
Joint /Trustee Client Signature        Date

Joint/Trustee's TIN to be used by Oppenheimer is:

☐ Social Security Number or ☐ EIN

[ | | | | | | | | | | ]

☐ Joint/ ☐ Trust/Estate

(X) _____
Joint Client Signature        Date

Joint Client's TIN to be used by Oppenheimer is:

☐ Social Security Number or ☐ EIN

[ | | | | | | | | | | ]

☐ Joint ☐ Trust/Estate

SEP 0 9 2014

**PLEASE COMPLETE, SIGN, DETACH, AND RETURN TO THE OFFICE SERVICING YOUR ACCOUNT**



PLEASE NOTE THAT THIS AGREEMENT SHOULD BE USED BY THE FOLLOWING ACCOUNTS:

- **Individual/Sole Proprietor Accounts**
- **Individual Retirement Accounts**
- **Custodial Accounts (UGMA and UTMA)**
- **Joint/Trustee Accounts**
- **Trust/Estate Accounts**

### HAVE YOU REMEMBERED TO PROVIDE OR COMPLETE THE FOLLOWING:

- **Your Taxpayer Identification Number?**
- **All signatures and Taxpayer Identification Number(s) if you are opening a joint or multiple owner account and completed Paragraph 31?**
- **The correct Taxpayer Identification Numbers(s) if you are opening a custodianship or trusteeship account?**
- **Signature(s) in the appropriate place at the bottom of Page 6 if you are opening a Margin Account?**
- **Your account number on the top of Page 5, if applicable, and Page 6?**
- **Your preference, to the extent applicable, in Paragraph 34 and 35 ("DISCLOSURES TO ISSUERS" and "DISCLOSURES TO AFFILIATED AND NONAFFILIATED THIRD PARTIES" respectively")**

FOR FURTHER INFORMATION, PLEASE CONTACT YOUR OPPENHEIMER & CO. INC. FINANCIAL ADVISOR, OR THE LOCAL BRANCH OFFICE SERVICING YOUR ACCOUNT.



## INSTRUCTIONS – REQUEST FOR TAXPAYER IDENTIFICATION NUMBER AND CERTIFICATION

In compliance with federal regulations, Oppenheimer & Co. Inc. is required to obtain your taxpayer identification number. For most individuals, this is your social security number. You should insert your taxpayer identification number ("TIN") within the appropriate space(s) on Page 6 of the FIRM COPY of the Oppenheimer & Co. Inc. Client Agreement.

Note: Check the appropriate box for the federal tax classification of the person whose name is entered on the "Name" line (Individual/Sole Proprietor, Trust/Estate).

**NOTE: These instructions pertain primarily to those persons with U.S. TINs. Non-U.S. persons and/or those who are not eligible for U.S. TINs must complete one of the following forms, which will be sent to you:**

| | |
|---|---|
| **W-8BEN:** | Certificate of Foreign Status of Beneficial Owner for U.S. Tax Withholding |
| **W-8ECI:** | Certificate of Foreign Person's Claim for Exemption from Withholding of Income Effectively Connected with the Conduct of a Trade or Business in the U.S. |
| **W-8EXP:** | Certificate of Foreign Government or Other Foreign Organization for U.S. Tax Withholding |
| **W-8IMY:** | Certificate of Foreign Intermediary, Foreign Partnership or Certain U.S. Branches for U.S. Tax Withholding |

## INSTRUCTIONS AND GENERAL INFORMATION

1) **PROVIDING TINs** – ALL PERSONS OR ENTITIES WHO OPEN OR MAINTAIN AN ACCOUNT WITH OPPENHEIMER & CO. INC. MUST PROVIDE THEIR TIN. If you do not have a TIN, you should contact your local Social Security Administration Office immediately, and let us know as soon as possible thereafter when you have received your TIN.

2) **CERTIFICATION** – By executing the Oppenheimer & Co. Inc. Client Agreement, you certify that the TIN you have provided to us is your correct number and that you are not currently subject to back up withholding for any reason.

3) **BACKUP WITHHOLDING** – If you fail to provide us with your TIN, or if the IRS has previously notified you that you are subject to backup withholding, Oppenheimer & Co. Inc. must by law withhold and pay to the IRS 28% of interest, dividends and gross proceeds paid you.

4) **TINs FOR JOINT ACCOUNTS AND CUSTODIAN ACCOUNTS** – In all cases where there is more than one account owner, you should list first and preferably circle the name of the person whose TIN should be associated with the account. If no name is circled when there is more than one name, the number posted to the account will be considered to be that of the first name listed. All joint owners must each provide their TIN. Remember that for custodian (UGMA) accounts you should furnish the TIN for the minor as the TIN for the account. To avoid confusion, circle the minor's name and TIN.

5) **EXEMPTIONS FROM BACKUP WITHHOLDING AND REPORTING** – Our policy requires all account holders to provide us with certified TINs. The Internal Revenue Code grants exemptions from information reporting and backup withholding for certain types of payments received by certain types of account holders, which include but may not necessarily be limited to the following:

- Corporations
- Retirement or Pension/Profit Sharing Plan Accounts (subject to 1099 R and /or 5498 reporting instead)
- U.S. Government or U.S. Government agency or instrumentality
- A state, the District of Columbia, a possession of the U.S. or any subdivision or instrumentality thereof
- An international organization or any agency or instrumentality thereof
- A non -U.S. central bank of issue
- A dealer in securities or commodities required to register in the U.S. or a possession of the U.S.
- A futures commission merchant ("FCM") registered with the C.F.TC.
- A real estate investment trust
- An entity registered at all times during the tax year under the Investment Company Act of 1940
- A common trust fund operated by a bank under Section 584 (a)
- A middleman known in the investment community as a nominee or custodian



## Margin Account Disclosures

Dear Client:

Oppenheimer & Co. Inc. (Oppenheimer) is furnishing this document to you in order to provide some basic facts about purchasing securities on margin, and to alert you to the risks involved with trading securities in a margin account. Before trading stocks in a margin account, you should carefully review the margin agreement that accompanies this disclosure form. Consult your Financial Advisor regarding any questions or concerns you may have with your margin accounts.

When you purchase securities, you may pay for the securities in full or you may borrow from Oppenheimer part of the purchase price. If you choose to borrow funds from us, you will need to open a margin account. The securities purchased are the firm's collateral for our loan of funds to you. If the securities in your account decline in value, so does the value of the collateral supporting your loan, and as a result the firm can, and sometimes must, take action, such as issue a margin call, and /or sell securities or other assets in any of your accounts held at Oppenheimer, in order to maintain the required equity in the account relative to the value of the account and the amount borrowed.

It is important that you fully understand the risks involved in trading securities on margin. These risks include the following:

**You can lose more funds than you deposit in the margin account.**
A decline in the value of securities that are purchased in your margin account may require you to deposit additional funds into your Oppenheimer account in order to avoid the forced sale of those securities or other securities or assets in your account(s).

**The firm can force the sale of securities or other assets in your account(s).**
If the equity in your margin account falls below the maintenance margin requirements or the firm's higher "house" requirements, the firm can sell, at its sole discretion, securities or other assets in any of your accounts held at the firm to cover the margin deficiency. You also will be responsible for any short fall in the account after such a sale.

**The firm can sell your securities or other assets without contacting you.**
Some investors mistakenly believe that a firm must contact them for a margin call to be valid, and that the firm cannot liquidate securities or other assets in their accounts to meet the call unless the firm has contacted them first. This is not the case. Most .firms will attempt to notify their customers of margin calls, but they are not required to do so. However, even if a firm has contacted a customer and provided a specific date by which the customer can meet a margin call, the firm can still take necessary steps to protect its financial interests, including immediately selling the securities without notice to the customer.

**You are not entitled to choose which securities or other assets in your account(s) are liquidated or sold to meet a margin call.**
Because the securities are collateral for the margin loan, the firm has the right to decide which securities to sell in order to protect its interest.

**The firm can increase "house" maintenance margin requirements at any time and is not required to provide you advance written notice.**
These changes in firm policy often take effect immediately and may result in the issuance of a maintenance margin call. Your failure to satisfy the call may cause Oppenheimer to liquidate securities in your account(s).

**You are not entitled to an extension of time on a margin call.**
While an extension of time to meet margin requirements may be available to customers under certain conditions, a customer does not have the right to an extension of time.

**The firm may lend or hypothecate securities in your margin account(s).If a debit balance exists in your margin account, the firm may, within the limitations imposed by applicable law, pledge, repledge, hypothecate or rehypothecate, securities in your margin account(s). In this event, your ability to exercise certain attendant rights of ownership with respect to such pledged or hypothecated securities, including, without limitation, the exercise of any voting rights, may be limited.  Additionally, you will be at risk of losing your qualified dividend status and consequently, any preferential tax rates on dividends.**



# Disclosure Statement

Dear Client:

We wish to inform you of the terms and conditions under which interest charges will be applied to your account with us.

1. You will be charged interest on any credit extended to or maintained for you by Oppenheimer & Co. Inc. ("Oppenheimer", "we", "our" or "us") for the purpose of purchasing, carrying, or trading in any securities, or otherwise.

2. The annual rate of interest that you will be charged is set forth below and is based on your average debit balance for the period and our base lending rate ("Our Base Lending Rate"). Our Base Lending Rate is the rate quoted daily by Oppenheimer at our main office in New York. In determining Our Base Lending Rate, we consider the brokers' call rates posted by various money center banks that we select (which may vary from time to time), other representative brokers' call rates, such as the "Call money" rate published by the Wall Street Journal and the New York Times, other commercially recognized rates, such as "Prime rates," and the actual rate that we are charged when borrowing money. We use no mathematical formula in determining Our Base Lending Rate, although the rate will never exceed the highest of the rates described above, rounded to higher than ¼ of 1%.

| AVERAGE DEBIT BALANCE | AMOUNT ADDED TO OUR BASE LENDING RATE |
|---|---|
| $100,000 and above | ¾% |
| $75,000-$99,999 | 1% |
| $50,000-$74,999 | 1¼% |
| $25,000-$49,999 | 1¾% |
| $10,000-$24,999 | 2¼% |
| $1-$9,999 | 2¾% |

The rate that you will be charged is subject to change without notice in accordance with changes in Our Base Lending Rate or changes in your average debit balance. If the interest rate is increased for any other reason you will be given at least 30 days prior written notice.

3. Debit balances represent money loaned to you by Oppenheimer. When you purchase securities on margin you must pay the amount required by regulations of the Federal Reserve Board and the balance of the purchase price is loaned to you. This loaned portion creates the debit balance upon which interest is charged.

Each additional purchase adds to your debit balance, as do your interest charges and any other charge that maybe assessed to your account.

4. Any credit or debit balance in the cash account will be combined with the balance in the margin account for the purpose of computing interest. Only one net entry for interest will appear in the margin account. Interest charges will be made on any extension of credit even if it is not directly related to purchases in your margin account. Examples of such extensions of credit would include, but not be limited to, prepayments to you for securities sold and late payments received from you on purchases in your cash account. Interest charged shall be determined by the rate applied to your margin account.

5. Our interest period runs from the 16th day of the prior month to the 15th day of the current month. Interest is calculated on the average net daily debit balance, which includes any credit and debit balances in your cash and margin accounts during the interest period. The interest charge is determined by multiplying the average net daily debit balance by the rate of interest and by a fraction, the numerator of which is the number of days the debit balance existed and the denominator of which is three hundred sixty (360). Your monthly statement will show the average daily balance and the interest rate used to arrive at the amount of interest charged.

Any credit that appears on your statement due to short sales (including short sales against the box) is offset by a debit of like amount because Oppenheimer has to borrow the security in order to deliver to the buying broker. For the purpose of computing interest, the credit generated by any short sales against the box does not reduce your debit balance until the short position is covered.

If the security that you sold short (or sold short against the box) appreciates in market price over the selling price, interest may be charged on the appreciation in value. If the security that you sold short depreciates in market price, the debit balance is correspondingly reduced by the decrease in value. This practice is known as "marking-to-the-market". Daily closing prices are used to determine any appreciation or depreciation of the security sold short.

6. On all securities which Oppenheimer has or at any time may hold or carry for you in any account of yours (either individually or jointly with others), or which may be deposited with Oppenheimer for any purpose, including safekeeping, Oppenheimer as a pledgee has a general lien for the discharge of all your obligations to it, however arising and irrespective of the number of accounts you have with it.

Any securities in any of your accounts are collateral for any debit balance in your accounts with us. A lien is created by these debits to secure the amount of the money owed to Oppenheimer. This means that, in accordance with the terms of the margin and lending provisions of the Client Agreement, securities in your accounts can be sold to reduce or to liquidate entirely any debit balance in your account.

7. Oppenheimer may require you to deposit additional collateral in accordance with the rules and regulations of the Federal Reserve Board, the Financial Industry Regulatory Authority, the American Stock Exchange and any other regulatory agency to whose jurisdiction Oppenheimer is subject, and in addition, may require you to deposit such additional collateral as Oppenheimer, in its sole discretion, determines is needed as security for your obligations to Oppenheimer. If there is a decline in the market value of your securities, Oppenheimer may request that you deposit additional collateral in order to improve the margin in your account or accounts. It is the general policy of Oppenheimer to require margin customers to maintain at least a 35% margin, although a higher margin applies for certain securities (including stocks and corporate bonds trading at or below a specified price as determined from time to time by Oppenheimer, and put or call options), and a lower margin applies for certain other securities (including Government and municipal securities and corporate bonds trading at or above a specified price as determined from time to time by Oppenheimer). Oppenheimer always reserves the right to require additional margin any time it deems this desirable. Margin calls can be satisfied by the deposit of additional securities and/or funds. You are invited to ask your Financial Advisor for more detail about the above.

Oppenheimer & Co. Inc.
85 Broad Street
New York, NY 10004



# CLIENT AGREEMENT

FOR USE BY INDIVIDUAL; JOINT; SOLE PROPRIETOR;
NON-CORPORATE TRUST AND ESTATE ACCOUNTS

**Please read carefully, sign and return FIRM COPY**

**To: Oppenheimer & Co. Inc.**
85 Broad Street
New York, NY 10004

In consideration of Oppenheimer & Co. Inc. ("Oppenheimer") opening or maintaining one or more accounts (each an "Account") for the undersigned (the "Client"), the Client agrees to the terms and conditions contained in this Agreement. The heading of each provision of this Agreement is for descriptive purposes only and shall not be deemed to modify or qualify any of the rights or obligations set forth in each such provision. For purposes of this Agreement, "securities and other property" means, but is not limited to, money, securities, deposits at a bank or other depository institution, financial instruments and commodities of every kind and nature and related contracts and options, except that the provisions of Paragraphs 33 and 34 herein (the arbitration clauses) shall not apply to commodities accounts. This definition includes securities or other property currently or hereafter held, carried or maintained by the Client for any purpose, in and for any of the Accounts now or hereafter opened (except where expressly indicated otherwise), including any account in which the Client may have an interest and all other property usually and customarily dealt in by brokerage firms, benefits, claims, demands, rights and entitlements arising therefrom or attaching thereto, and all proceeds and distributions thereof.

**1. APPLICABLE RULES AND REGULATIONS.** This Agreement and its enforcement shall be governed by and construed in accordance with the laws of the State of New York without giving effect to the choice of law or conflicts of law provisions thereof. All transactions for Client's Account shall be subject to the regulations of all applicable federal, state and self-regulatory agencies, including, but not limited to, the U.S. Securities and Exchange Commission, the various securities and commodity exchanges, the Municipal Securities Rulemaking Board, the Financial Industry Regulatory Authority ("FINRA"), the Internal Revenue Service, the Board of Governors of the Federal Reserve System, and the constitution, rules and customs of the exchange or market (and its clearing house, if any) where executed. Client agrees not to exceed the exercise limits and/or position limits set by the option exchanges, for Client's own Account, whether acting alone or in concert with others.

**2. ENTIRE UNDERSTANDING AND ASSIGNMENT.** This Agreement contains the entire understanding between the Client and Oppenheimer concerning the subject matter of this Agreement and supersedes any and all prior agreements between the parties concerning the subject matter herein. Client may not assign the rights and obligations hereunder without first obtaining the prior written consent of Oppenheimer.

**3. SEVERABILITY.** If any provision of this Agreement is held to be invalid, void or unenforceable by reason of any law, rule, administrative order or judicial decision, that determination shall not affect the validity of the remaining provisions of this Agreement.

**4. WAIVER.** Except as specifically permitted in this Agreement, no provision of this Agreement can be, nor be deemed to be, waived, altered, modified or amended unless such is agreed to in a writing signed by Oppenheimer and any failure by Oppenheimer to insist at any time upon strict compliance with this Agreement or with any of its terms shall not constitute or be considered a waiver by Oppenheimer of any of its rights.

**5. DELIVERY OF SECURITIES.** Without abrogating any of Oppenheimer's rights under any other portion of this Agreement and subject to any indebtedness of the Client to Oppenheimer, the Client may demand to receive physical delivery of fully-paid securities in his/her account. If physical certificates are not available, such security positions will be electronically transferred to an account in the Client's name at the applicable transfer agent. Oppenheimer may, but shall not be obligated to, charge the Client for such activities.

**6. LIENS.** All securities and other property of the Client in any account in which the Client has an interest (except with respect to Client's retirement accounts) shall be subject to a lien for the discharge of any and all indebtedness or any other obligation of the Client to Oppenheimer. All securities and other property of the Client (except securities or property held in a Client's retirement account) shall be held by Oppenheimer as security for the payment of any such obligations or indebtedness to Oppenheimer in any Account that the Client may have an interest, and Oppenheimer subject to applicable law may, at any time and without prior notice to the Client, use and/or transfer any or all securities and other property interchangeably in any Account(s) in which the Client has an interest. In enforcing such lien or security interest, Oppenheimer shall have the discretion to determine which property is to be sold and the order in which it is to be sold and shall have, in addition to all other rights and remedies available to it, all the rights and remedies available to a secured party under the New York Uniform Commercial Code, in effect from time to time.

**7. PLEDGE OF SECURITIES AND OTHER PROPERTY.** Within the limitations imposed by applicable laws, rules and regulations (including, but not limited to, all applicable laws, rules and regulations relating to retirement accounts), all securities and other property of the Client may be pledged and repledged and hypothecated and rehypothecated by Oppenheimer from time to time, without notice to the Client, either separately or in common with such other securities and other property of other bona fide Clients of Oppenheimer, for any amount due to Oppenheimer in the Client's Account(s). Oppenheimer may do so without retaining in its possession, or under its control for delivery, a like amount of similar securities or other property. The Client's ability to exercise certain attendant rights of ownership with respect to such pledged or hypothecated securities, including, without limitation, the exercise of any voting rights, may be limited. Additionally, Client will be at risk of losing Client's qualified dividend status and consequently, any preferential tax rates on dividends.

**8. INTEREST.** Debit balances of the Account(s) of the Client shall be charged with interest in accordance with Oppenheimer's established custom, as disclosed to the Client pursuant to the provisions of Rule 10b -16 of the Securities Exchange Act of 1934. Attached to Client's copy of this agreement is the Disclosure Statement, which the Client should read and retain. By signing this Agreement, Client acknowledges that it has read the Disclosure Statement and understands the type, amount and manner of interest that will be charged on all debit balances.

**9. MARGIN.** In accordance with applicable laws, rules and regulations, Clients holding retirement accounts are prohibited from trading on margin. Consequently, retirement account owners should deem this section, as well as Sections 10, 11 and 12, inapplicable to their retirement account. When the Client purchases securities, the Client may pay for the securities in full or, in Oppenheimer's discretion, borrow from Oppenheimer part of the purchase price. If the Client chooses to borrow funds from Oppenheimer, the Client will need to open a margin account. The securities purchased are Oppenheimer's collateral for its loan of funds to the Client. If the securities in the Client's account decline in value, so does the value of the collateral supporting the loan, and as a result, Oppenheimer can, and sometimes must, take action, such as issue a margin call and/or sell securities or other assets in any of the Client's accounts held at Oppenheimer in order to maintain the required equity in the account relative to the value of the account and the amount borrowed. The Client agrees to maintain in all accounts with Oppenheimer such positions and margins as required by all applicable statutes, rules, regulations, procedures and custom, or as Oppenheimer deems necessary or advisable. The Client further agrees to promptly satisfy all margin and maintenance calls. It is the general policy of Oppenheimer to require margin Clients to maintain at least a 35% margin, although a higher margin percentage applies for certain securities (including stocks and corporate bonds trading at or below a specified price as determined from time to time by Oppenheimer, and put or call options), and a lower margin percentage applies for certain other securities (including Government and municipal securities and corporate bonds trading at or above a specified price as



determined from time to time by Oppenheimer). Oppenheimer always reserves the right to require additional margin any time it deems this desirable. Margin calls can be satisfied by the deposit of additional securities and/or funds.

**10. MARGIN RISK DISCLOSURES. IT IS POSSIBLE TO LOSE MORE FUNDS THAN ARE DEPOSITED IN A MARGIN ACCOUNT. A DECLINE IN THE VALUE OF SECURITIES THAT ARE PURCHASED IN THE CLIENT'S MARGIN ACCOUNT MAY REQUIRE THAT THE CLIENT DEPOSIT ADDITIONAL FUNDS INTO THE CLIENT'S MARGIN ACCOUNT IN ORDER TO AVOID THE FORCED SALE OF THOSE SECURITIES OR OTHER SECURITIES OR ASSETS IN THE CLIENT'S ACCOUNT. ALTHOUGH OPPENHEIMER MAY, IN CERTAIN LIMITED CIRCUMSTANCES, GRANT AN EXTENTION OF TIME TO MEET MARGIN REQUIREMENTS, THE CLIENT IS NOT ENTITLED TO ANY EXTENSION OF TIME AND UNDERSTANDS THAT IT DOES NOT HAVE ANY RIGHT TO SAME.**

**11. DISCLOSURES REGARDING LIQUIDATIONS AND COVERING POSITIONS. THE CLIENT SHOULD CLEARLY UNDERSTAND THAT, NOTWITHSTANDING A GENERAL POLICY OF GIVING CLIENTS NOTICE OF A MARGIN DEFICIENCY, OPPENHEIMER IS NOT OBLIGATED TO REQUEST ADDITIONAL MARGIN FROM THE CLIENT IN THE EVENT THE CLIENT'S ACCOUNT FALLS BELOW MINIMUM MAINTENANCE REQUIREMENTS. MORE IMPORTANTLY, THERE MAY/WILL BE CIRCUMSTANCES WHERE OPPENHEIMER WILL LIQUIDATE SECURITIES AND/OR OTHER PROPERTY IN ANY OF THE CLIENT'S ACCOUNTS, IN ITS DISCRETION AND WITHOUT NOTICE TO THE CLIENT, TO ENSURE THAT MINIMUM MAINTENANCE REQUIREMENTS ARE SATISFIED.    THE CLIENT WILL BE RESPONSIBLE FOR ANY DEBIT IN THE ACCOUNT AFTER A SALE TO MEET THE MINIMUM MAINTENANCE REQUIREMENTS. FURTHER, THE CLIENT UNDERSTANDS THAT THE CLIENT IS NOT ENTITLED TO CHOOSE WHICH SECURITIES OR ASSETS ARE LIQUIDATED OR SOLD TO MEET A MARGIN CALL.**

**12. LIQUIDATIONS AND COVERING POSITIONS. OPPENHEIMER SHALL HAVE THE RIGHT, IN ACCORDANCE WITH ITS GENERAL POLICIES REGARDING MARGIN MAINTENANCE REQUIREMENTS, WHICH ARE SUBJECT TO CHANGE IN ITS DISCRETION WITHOUT NOTICE TO CLIENT, TO: [1:] REQUIRE ADDITIONAL COLLATERAL OR [2:] TO LIQUIDATE ANY SECURITIES AND OTHER PROPERTY WHENEVER, IN OPPENHEIMER'S DISCRETION, OPPENHEIMER CONSIDERS IT NECESSARY FOR ITS PROTECTION INCLUDING, BUT NOT LIMITED TO: THE FAILURE OF THE CLIENT TO PROMPTLY MEET ANY CALL FOR ADDITIONAL COLLATERAL; THE FILING OF A PETITION IN BANKRUPTCY BY OR AGAINST THE CLIENT; THE APPOINTMENT OF A RECEIVER IS FILED BY OR AGAINST CLIENT; AN ATTACHMENT IS LEVIED AGAINST ANY ACCOUNT OF THE CLIENT OR IN WHICH THE CLIENT HAS AN INTEREST; OR THE CLIENT'S DEATH. IN SUCH EVENT, OPPENHEIMER IS AUTHORIZED TO SELL ANY AND ALL SECURITIES AND OTHER PROPERTY IN ANY ACCOUNT OF THE CLIENT, WHETHER CARRIED INDIVIDUALLY OR JOINTLY WITH OTHERS; TO BUY ALL SECURITIES OR OTHER PROPERTY WHICH MAY BE SHORT IN SUCH ACCOUNT(S), TO CANCEL ANY OPEN ORDERS AND TO CLOSE ANY OR ALL OUTSTANDING CONTRACTS, ALL WITHOUT DEMAND FOR MARGIN OR ADDITIONAL MARGIN, OTHER NOTICE OF SALE OR PURCHASE, OR OTHER NOTICE OR ADVERTISEMENT, EACH OF WHICH IS EXPRESSLY WAIVED BY THE CLIENT. ANY SUCH SALES OR PURCHASES MAY BE MADE AT OPPENHEIMER'S DISCRETION ON ANY EXCHANGE OR OTHER MARKET WHERE SUCH BUSINESS IS USUALLY TRANSACTED OR AT PUBLIC AUCTION OR PRIVATE SALE, AND OPPENHEIMER MAY BE THE PURCHASER FOR OPPENHEIMER'S OWN ACCOUNT. IT IS UNDERSTOOD THAT A PRIOR DEMAND OR CALL, OR PRIOR NOTICE OF THE TIME AND PLACE OF SUCH SALE OR PURCHASE, SHALL NOT BE CONSIDERED A WAIVER OF OPPENHEIMER'S RIGHT TO SELL OR BUY WITHOUT DEMAND OR NOTICE AS HEREIN PROVIDED.**

**13. SATISFACTION OF INDEBTEDNESS.** The Client agrees to satisfy, upon demand, any indebtedness, and to pay any debit balance remaining when the Client's Account is closed. Client Account(s) may not be closed

without Oppenheimer first receiving all securities and other property for which the Account is short and all funds to pay in full for all securities and other property in which the Account(s) are long, including any interest charges accrued thereon.

**14. TRANSACTIONS AND SETTLEMENTS.** All orders for the purchase or sale of securities and other property will be authorized by the Client and executed with the understanding that an actual purchase or sale is intended and that it is the Client's intention and obligation in every case to deliver certificates or commodities to cover any and all sales or to pay for any purchase upon Oppenheimer's demand. If Oppenheimer makes a short sale of any securities and other property at the Client's direction or if the Client fails to deliver to Oppenheimer any securities and other property that Oppenheimer has sold at the Client's direction, Oppenheimer is authorized to borrow the securities and other property necessary to enable Oppenheimer to make delivery and the Client agrees to be responsible for any cost or loss Oppenheimer may incur, or the cost of obtaining the securities and other property if Oppenheimer is unable to borrow it. Oppenheimer is the Client's agent to complete all such transactions and is authorized to make advances and expend monies as are required.

**15. SALES BY CLIENT.** The Client understands and agrees that any order to sell "short" will be designated as such by the Client, and that Oppenheimer will mark the order as "short". A "short" sale means any sale of a security not owned by the seller or any sale that is consummated by delivery of a borrowed security. The Client agrees that all other sell orders will be for securities owned ("long"), at that time, by the Client. The designation on a sale order as "long" is a representation by the Client that the Client owns the security. By placing the order the Client affirms that he/she will deliver the securities on or before the settlement date. In the event of non-delivery, the Client agrees to settlement as described in Paragraph 14.

**16. RESTRICTIONS ON TRADING.** The Client understands that Oppenheimer may, in its sole discretion, prohibit or restrict trading of securities or substitution of securities in any of the Client's Account(s).

**17. ORAL AUTHORIZATIONS.** The Client agrees that Oppenheimer shall incur no liability in acting upon any oral instructions given to Oppenheimer concerning the Client's Account(s), provided such instructions reasonably appear to be genuine.

**18. CREDIT INFORMATION AND INVESTIGATION.** The Client authorizes Oppenheimer to obtain reports concerning the Client's credit standing and business conduct at Oppenheimer's discretion. Upon the Client's request, Oppenheimer will inform the Client whether it has obtained credit reports, and if it has, Oppenheimer will inform the Client of the name and address of the consumer reporting agency that furnished the reports to Oppenheimer.

**19. USA PATRIOT ACT.** The Client understands that certain federal laws and regulations, including the United and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001 ("USA PATRIOT Act") require financial institutions, such as Oppenheimer, to obtain, verify and record information that identifies the Client. By signing this Agreement, the Client agrees to the collection and verification of such identifying information by Oppenheimer and acknowledges that Oppenheimer may not be able to open an account or maintain a relationship with the Client unless it is able to do so. Additionally, the Client represents that the Client Account(s) will not be used for any transaction with, or for the benefit of, any person, entity or country that is the subject of any sanctions administered or enforced by the US Treasury Department's Office of Foreign Assets Control.

**20. OPPENHEIMER AS AGENT.** The Client understands that Oppenheimer is acting as the Client's agent, unless Oppenheimer notifies the Client in writing before the settlement date for the transactions that Oppenheimer is acting as a dealer for its own account or as agent for some other person.

**21. FEES.** The Client understands that it may be subject to certain fees associated with the maintenance of the Client's Account(s). By signing this



Agreement, the Client acknowledges that it has received, read and understands the Disclosure Statement accompanying this Agreement.

**22. TEMPORARY INVESTMENT OF FREE CREDIT BALANCES; PRINCIPAL AND INTEREST PAYMENTS.** Client authorizes, but does not require, Oppenheimer to automatically invest on a periodic basis the free credit balances in Client's Account ("Sweep Transactions"), including interest paid to Client, on deposit accounts at certain banks or other depository institutions at which Oppenheimer maintains an omnibus account in the name of Oppenheimer as agent for its clients ("Advantage Bank Deposit Program"), or in the absence of an oral or written selection by Client, in the Advantage Bank Deposit Program ("Cash Investment Options"). Client may elect to liquidate any cash investment at any time by contacting his/her Financial Advisor. Client understands that Oppenheimer may terminate Client's automatic cash investment account if Client's Account becomes inactive for a period of 90 days and/or if the credit balance falls below a minimum balance. Oppenheimer is not required to remit interest or dividends to Client on a daily basis. Oppenheimer may withdraw the amounts invested in the Advantage Bank Deposit Program, without notice, to the extent necessary to satisfy any debits arising in Client's Account. Client acknowledges that interest will not be paid to Client on credit balances in Client's Account unless specifically agreed to by Oppenheimer. Oppenheimer may credit Client's Account with principal and interest due on debt securities held in Client's Account on the payment dates, but Oppenheimer is entitled to recover any such payments from Client if the same are not actually received by Oppenheimer from the trustee or paying agent.

All Sweep Transactions between Client's Account and the Advantage Bank Deposit Program, if designated as Client's Cash Investment Option, will appear on Client's periodic Account statements. The statements are provided in lieu of separate confirmations of those transactions. Information about the Advantage Bank Deposit Program that is available as a Cash Investment Option in connection with the cash Sweep Transactions, including the terms and conditions, interest rates, restrictions, and fees, is contained in the Terms and Conditions of the Advantage Bank Deposit Program and Disclosure Statement that are supplements to this Agreement. Client should read these documents carefully.

Oppenheimer may change the Cash Investment Option associated with Client's Account from time to time, or the terms of the Cash Investment Options, by providing at least 30 days' prior written notice to Client. By maintaining the Client's Account without written objection to Oppenheimer of Client's objection within the time period and at the address specified in the notice of change, Client shall be deemed to have consented to the change in the Cash Investment Option associated with Client's Account or to a change in the terms of the Cash Investment Option.

**23. CONFIRMATIONS AND STATEMENTS.** Confirmations of transactions and statements for the Client's Account(s) shall be binding upon the Client if the Client does not object, in writing, within 30 days after receipt by the Client. Notice or other communications, including margin and maintenance calls, delivered or mailed to the address provided by Client and listed on Client's New Account Form shall, until Oppenheimer has received notice in writing of a different address, be deemed to have been personally delivered to the Client whether actually received or not.

**24. CORRESPONDENT ACCOUNTS.** If any of the Client's Account(s) have been introduced to Oppenheimer and are carried by Oppenheimer only as a clearing broker, Client agrees that Oppenheimer is not responsible for the conduct of the introducing broker, and Oppenheimer's only responsibilities to Client relate to the execution, clearing and bookkeeping of transactions for the Client's Account(s). Furthermore, Client agrees that the introducing broker and its employees are third party beneficiaries of this Agreement.

**25. SUCCESSORS.** Client hereby agrees that this Agreement and all the terms thereof shall be binding upon Client's heirs, executors, administrators, successors, personal representatives, conservators and assigns ("Successors"). In the event of the Client's death, incompetency or disability, whether or not any Successors of the Client's estate and property shall have qualified or been appointed, Oppenheimer may continue to operate as though the Client were alive and competent and may liquidate the Client's account as described herein without prior notice or demand upon the Client's Successors. This Agreement shall inure to the benefit of Oppenheimer's present organization, and any successor organization or assigns, irrespective of any change or changes at any time in the personnel thereof, for any cause whatsoever, and the Client's Account(s) may be transferred to any such successors or assigns.

**26. CAPACITY TO CONTRACT, CLIENT AFFILIATION.** By signing below, the Client represents that he/she is of legal age, and that he/she is not an employee of any exchange, any corporation of which any exchange owns a majority of the capital stock, a member of any exchange, a member firm or member corporation registered on any exchange, a bank, trust company, insurance company or of any corporation, firm or individual engaged in the business of dealing, either as broker or as principal, in securities, bills of exchange, acceptances or other forms of commercial paper. Further, the Client will promptly notify Oppenheimer in writing to the extent that the foregoing is no longer true. The Client also represents that no one except the Client has an interest in the account or accounts of the Client with Oppenheimer.

**27. PRIVACY DISCLOSURE.** By signing this Agreement, Client acknowledges having received Oppenheimer's Privacy Disclosure and further, that Client has read and understood it.

**28. SIPC COVERAGE AND FDIC INSURANCE.** Cash and securities held by Oppenheimer in Client's Account are protected through Oppenheimer's membership in the Securities Investor Protection Corporation ("SIPC") up to an amount of $500,000, including up to $250,000 in cash. Oppenheimer supplements this protection for the remainder of cash and securities in Client's Account for a combined protection in the amount of $100,000,000. Client balances held in bank deposits available as a Cash Investment Option are not covered by SIPC. Information about SIPC may be found at www.sipc.org or by calling (202) 371-8300. SIPC coverage protects brokerage customers against misappropriation or disappearance of cash or securities in a customer's account at a broker-dealer firm during the bankruptcy of the broker-dealer, but does not protect against a decline in the value of securities or other assets. SIPC coverage is different from insurance coverage provided by the Federal Deposit Insurance Corporation ("FDIC"). FDIC insurance protects against the loss, to a certain maximum amount, of a customer's deposits if an FDIC-insured depository institution fails. Amounts in the Advantage Bank Deposit Program are not covered by SIPC. Rather, such amounts (including principal and accrued interest) held at the same depository institution per depositor for all accounts held in the same title and capacity are insured by the FDIC up to the Maximum Applicable Deposit Insurance amount permitted under federal law ($250,000 for individual and retirement accounts and $500,000 for joint accounts). More information about FDIC insurance is available at www.fdic.gov.

**29. TERMINATION.** Oppenheimer has the right to terminate any of Client's Account(s) (including multiple owner accounts) at any time by notice to Client. Furthermore, Oppenheimer reserves the right to reject or cancel any order and close any Account(s) in its reasonable discretion.

**30. AMENDMENT.** Oppenheimer may amend this Agreement at any time upon prior written notice to Client.

OPPENHEIMER

**31. NEW ACCOUNT APPLICATION.** The Client acknowledges that it has received and read Oppenheimer's New Account Application, and certifies that the information contained therein was provided by the Client to Oppenheimer and is true and accurate in all material respects. The Client agrees to notify the Oppenheimer office in which the Client is transacting business, without delay, of any changes or corrections in connection with any information contained in the New Account Application. This Paragraph is not applicable to correspondent accounts as described in Paragraph 24.

**32. JOINT ACCOUNTS.** If this is a joint account, Client jointly and severally agrees that each of the undersigned shall have the authority on behalf of Client's Account(s) to buy, sell (including short sales), and otherwise deal in, through Oppenheimer, securities and other property of all kinds, on margin or otherwise, to receive for the account and to dispose of money, securities and other property, make, terminate or modify for the Client Account(s) agreements relating to these matters or waive any of the provisions of such agreements, and generally to deal with each of the undersigned as if each alone were the Client Account(s) owner, all without notice to the other Client Account(s) owners. Each of the undersigned agrees that notice to any Client Account(s) owner shall be deemed to be notice to all Client Account(s) owners. Each Client Account(s) owner shall be jointly and severally liable for the Client Account(s).

Oppenheimer shall be entitled to follow the instructions of any of the undersigned concerning the Client Account(s) and make deliveries of any and all property in the Client Account(s), and make payments of any or all monies in the Client Account(s) as any of the undersigned may order and direct, even if such deliveries and/or payments shall be made to one of the undersigned personally, and not for the Client Account(s). Oppenheimer shall be under no obligation to inquire into the purpose of any such demand for delivery of property or payment, and Oppenheimer shall not be bound to see to the application or disposition of the said property and/or monies so delivered or paid pursuant to such instructions.

In the event of the death of any of the undersigned, the survivor(s) shall immediately give Oppenheimer written notice thereof, and Oppenheimer may, before or after receiving such notice, take such proceedings, require such documents, retain such portion and/or restrict transactions in the Client Account(s) as Oppenheimer may deem advisable to protect Oppenheimer against any tax, liability, penalty or loss under any present or future laws or otherwise. The estate of any of the undersigned who shall have died shall be liable and each survivor will be liable, jointly and severally, to Oppenheimer for any debt or loss in the Client Account(s) resulting from the completion of transactions initiated prior to Oppenheimer's receipt of a written notice of such death or incurred in the liquidation of the Client Account(s) or the adjustment of the interests of the respective parties.

Any taxes or other expenses becoming a lien against or being payable out of the Client Account(s) as the result of the death of any of the undersigned, or through the exercise by his or her estate or representatives of any rights in the Client Account(s), shall be chargeable against the interest of the survivor(s) as well as against the interest of the estate of the decedent. This provision shall not release the decedent's estate from any liability provided for in this Agreement.

| Office | Account Number | FA |
|--------|----------------|----|
|        |                |    |

OPPENHEIMER

**NAME:** _____

If the Joint Account is owned as Tenants in Common, each tenant shall be considered to have an equal ownership interest in the account unless other percentages of ownership are designated below.

If Client intends to open a Joint Account, the type of Joint Account must be indicated below. **PLEASE NOTE THAT IF CLIENT DOES NOT INDICATE WHICH TYPE OF JOINT ACCOUNT BY CHECKING THE APPROPRIATE BOX, THE JOINT ACCOUNT WILL BE DESIGNATED AS JOINT TENANTS WITH RIGHTS OF SURVIVORSHIP.**

☐ The undersigned are Joint Tenants with Rights of Survivorship, so that in the case of death of any of the undersigned, the Client Account(s), in the entirety, becomes the property of the survivor or survivors and as so vested, shall be subject to the terms and conditions of this Agreement without in any manner releasing the decedent's estate from liability.

☐ The undersigned are Tenants-by-the-Entirety (for legally married persons only).

☐ The Undersigned are Tenants in Common, each of the undersigned having an undivided interest therein. In the event of the death (in either or any of the undersigned, the interests in the Client Account(s) as of the close of business on the date of death of the decedent(s) (or on the next following business day if the date of death is not a business day), shall be vested as set forth below and shall continue to be subject to the terms and conditions of this Agreement, without in any manner releasing the decedent's estate from liability:

_____     _____
Print Name of Owner                         Percentage of Estate

_____     _____
Print Name of Owner                         Percentage of Estate

_____     _____
Print Name of Owner                         Percentage of Estate

_____     _____
Print Name of Owner                         Percentage of Estate

**33. ARBITRATION DISCLOSURES.**
THIS AGREEMENT CONTAINS A PREDISPUTE ARBITRATION CLAUSE. BY SIGNING AN ARBITRATION AGREEMENT THE PARTIES AGREE AS FOLLOWS:
A. ALL PARTIES TO THIS AGREEMENT ARE GIVING UP THE RIGHT TO SUE EACH OTHER IN COURT, INCLUDING THE RIGHT TO A TRIAL BY JURY, EXCEPT AS PROVIDED BY THE RULES OF THE ARBITRATION FORUM IN WHICH A CLAIM IS FILED.
B. ARBITRATION AWARDS ARE GENERALLY FINAL AND BINDING; A PARTY'S ABILITY TO HAVE A COURT REVERSE OR MODIFY AN ARBITRATION AWARD IS VERY LIMITED.
C. THE ABILITY OF THE PARTIES TO OBTAIN DOCUMENTS, WITNESS STATEMENTS AND OTHER DISCOVERY IS GENERALLY MORE LIMITED IN ARBITRATION THAN IN COURT PROCEEDINGS.
D. THE ARBITRATORS DO NOT HAVE TO EXPLAIN THE REASON(S) FOR THEIR AWARD UNLESS, IN AN ELIGIBLE CASE, A JOINT REQUEST FOR AN EXPLAINED DECISION HAS BEEN SUBMITTED BY ALL PARTIES TO THE PANEL AT LEAST 20 DAYS PRIOR TO THE FIRST SCHEDULED HEARING DATE.

E. THE PANEL OF ARBITRATORS WILL TYPICALLY INCLUDE A MINORITY OF ARBITRATORS WHO WERE OR ARE AFFILIATED WITH THE SECURITIES INDUSTRY.
F. THE RULES OF SOME ARBITRATION FORUMS MAY IMPOSE TIME LIMITS FOR BRINGING A CLAIM IN ARBITRATION. IN SOME CASES, A CLAIM THAT IS INELIGIBLE FOR ARBITRATION MAY BE BROUGHT IN COURT.
G. THE RULES OF THE ARBITRATION FORUM IN WHICH THE CLAIM IS FILED, AND ANY AMENDMENTS THERETO, SHALL BE INCORPORATED INTO THIS AGREEMENT.

**34. AGREEMENT TO ARBITRATE ALL CONTROVERSIES.** THE CLIENT AGREES, AND BY CARRYING AN ACCOUNT FOR THE CLIENT, OPPENHEIMER AGREES, THAT ALL CONTROVERSIES WHICH MAY ARISE BETWEEN THE CLIENT AND OPPENHEIMER AND ANY OF ITS OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR AFFILIATES RELATING TO, BUT NOT LIMITED TO, THOSE INVOLVING ANY TRANSACTION OR THE CONSTRUCTION, PERFORMANCE, OR BREACH OF THIS OR ANY OTHER AGREEMENT BETWEEN THE CLIENT AND OPPENHEIMER PERTAINING TO SECURITIES AND OTHER PROPERTY, WHETHER ENTERED INTO PRIOR, ON OR SUBSEQUENT TO THE DATE HEREOF, SHALL BE DETERMINED BY ARBITRATION. ANY ARBITRATION UNDER THIS AGREEMENT SHALL BE CONDUCTED PURSUANT TO THE FEDERAL ARBITRATION ACT AND THE LAWS OF THE STATE OF NEW YORK, BEFORE FINRA AND IN ACCORDANCE WITH ITS RULES THEN IN FORCE. THE AWARD OF THE ARBITRATORS, OR OF THE MAJORITY OF THEM, SHALL BE FINAL, AND JUDGMENT UPON THE AWARD RENDERED MAY BE ENTERED IN ANY COURT, STATE OR FEDERAL, HAVING JURISDICTION.

NO PERSON SHALL BRING A PUTATIVE OR CERTIFIED CLASS ACTION TO ARBITRATION, NOR SEEK TO ENFORCE ANY PRE-DISPUTE ARBITRATION AGREEMENT AGAINST ANY PERSON WHO HAS INITIATED IN COURT A PUTATIVE CLASS ACTION; WHO IS A MEMBER OF A PUTATIVE CLASS WHO HAS NOT OPTED OUT OF THE CLASS WITH RESPECT TO ANY CLAIMS ENCOMPASSED BY THE PUTATIVE CLASS ACTION UNTIL: (i) THE CLASS CERTIFICATION IS DENIED, (ii) THE CLASS IS DECERTIFIED, OR (iii) THE CLIENT IS EXCLUDED FROM THE CLASS BY THE COURT. SUCH FORBEARANCE TO ENFORCE AN AGREEMENT TO ARBITRATE SHALL NOT CONSTITUTE A WAIVER OF ANY RIGHTS UNDER THIS AGREEMENT EXCEPT TO THE EXTENT STATED HEREIN.

**35. DISCLOSURES TO ISSUERS.** Under Rule 14b - 1 (c) of the Securities Exchange Act of 1934, we are required to disclose to an issuer the name, address, and securities position of our Clients who are beneficial owners of that issuer's securities unless the Client objects. Therefore, unless Client indicates below that Client objects to the disclosure of such information, Client will be deemed to have waived any such objection.

☐ Yes, I object to the disclosure of such information.

**36. DISCLOSURES TO AFFILIATED AND NONAFFILIATED THIRD PARTIES.** Under Regulation S-P, Oppenheimer is permitted to share personal information collected from Client in the course of its relationship with Client with affiliated and nonaffiliated parties under certain circumstances without Client's approval. If Client does not want his/her personal information shared outside of these permitted circumstances with nonaffiliated third parties without Client's prior notification, Client must indicate this preference by checking where indicated below.

☐ Yes, I object to the disclosure of such information.
Further information on the circumstances under which such disclosures may be made may be found in Oppenheimer's Privacy Disclosure accompanying this Agreement.

**IF APPLICABLE, PLEASE COMPLETE, REMOVE, AND RETURN**

REDACTED

| Office | Account Number | | | | | FA | |
|---|---|---|---|---|---|---|---|
| ■■ | 7 | 1 | 8 | 2 | 6 | 5 | Y |



NAME: Susan Shapiro Cowan

**37. EMPLOYER IDENTIFICATION NUMBER AND CERTIFICATION** – Please refer to the accompanying Instructions before completing.

Under penalties of perjury, Client hereby certifies that:

1.  The number shown on this form is Client's correct Employer Identification Number ("EIN") (or Client is waiting for a number to be issued); and
2.  Client is not subject to backup withholding because: (a) Client is exempt from backup withholding, or (b) Client has not been notified by the Internal Revenue Service (IRS) that Client is subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified Client that Client is no longer subject to backup withholding; and
3.  Client is a U.S. entity (including a U.S. resident alien).
4.  Client is exempt from FATCA reporting because this account is being opened and held within the United States.

**CERTIFICATION INSTRUCTIONS.** Client must cross out item 2 above if Client has been notified by the IRS that Client is currently subject to backup withholding because Client has failed to report all interest and dividends on Client's tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends. Client is not required to sign the Certification, but Client must provide Client's correct EIN. (See enclosed Instructions)

**FOR THOSE EXEMPT FROM BACKUP WITHHOLDING (SEE ENCLOSED INSTRUCTIONS), PLEASE CHECK THE FOLLOWING BOX:**
☐ Client is exempt from backup withholding.

**THE ABOVE INSTRUCTIONS PERTAIN TO PRIMARILY THOSE CLIENTS WITH U.S. EINs. NON-U.S. PERSONS AND/OR THOSE WHO ARE NOT ELIGIBLE FOR U.S. EINs MUST COMPLETE ONE OF THE FORMS LISTED IN THE ENCLOSED INSTRUCTIONS. A W-8 FORM WILL BE PROVIDED AS NECESSARY.**

| IF OPENING AN INDIVIDUAL CASH ACCOUNT: | IF OPENING AN INDIVIDUAL MARGIN ACCOUNT: |
|---|---|
| BY SIGNING THIS AGREEMENT THE CLIENT ACKNOWLEDGES THAT CLIENT HAS RECEIVED A COPY OF THIS AGREEMENT AND HAS READ THIS AGREEMENT IN ITS ENTIRETY BEFORE SIGNING. THE CLIENT HAS ALSO RECEIVED AND READ THE DISCLOSURE STATEMENT, WHICH IS ATTACHED HERETO, THE OPPENHEIMER IMPORTANT DISCLOSURE DOCUMENT AND THE ACCOUNT INFORMATION FORM. | BY SIGNING THIS AGREEMENT THE CLIENT ACKNOWLEDGES THAT: <br> 1. THE SECURITIES IN THE CLIENT'S MARGIN ACCOUNT ARE UNENCUMBERED, FREELY PLEDGABLE, AND MAY BE LOANED TO OPPENHEIMER OR LOANED OUT TO OTHERS; AND <br> 2. THE CLIENT HAS RECEIVED A COPY OF THIS AGREEMENT AND HAS READ THIS AGREEMENT IN ITS ENTIRETY BEFORE SIGNING. THE CLIENT HAS ALSO RECEIVED AND READ THE DISCLOSURE STATEMENT, WHICH IS ATTACHED HERETO, THE OPPENHEIMER IMPORTANT DISCLOSURE DOCUMENT AND THE ACCOUNT INFORMATION FORM. |
| THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AS SET FORTH IN PARAGRAPHS 33 AND 34 ON PAGE 5. | 3. THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AS SET FORTH HEREIN IN PARAGRAPHS 33 AND 34 ON PAGE 5. |
| (X)_____ <br> Client Signature                    Date | (X) _S Cowan_____   _4/13/17_ <br> Client Signature                    Date |
| Client's TIN to be used by Oppenheimer is: | Client's TIN to be used by Oppenheimer is: |
| ☐ Social Security Number or ☐ EIN <br> ┌──┬──┬──┬──┬──┬──┬──┬──┬──┐ <br> └──┴──┴──┴──┴──┴──┴──┴──┴──┘ | ☑ Social Security Number or ☐ EIN <br> ████████████████████████ |
| ☐ Individual/Sole Proprietor  ☐ Trust/Estate | ☐ Individual/Sole Proprietor  ☐ Trust/Estate |
| IF OPENING A JOINT CASH ACCOUNT, PLEASE ENSURE THAT THE TYPE OF JOINT ACCOUNT INTENDED HAS BEEN INDICATED IN PARAGRAPH 32: | IF OPENING A JOINT MARGIN ACCOUNT, PLEASE ENSURE THAT THE TYPE OF JOINT ACCOUNT INTENDED HAS BEEN INDICATED IN PARAGRAPH 32: |
| (X)_____ <br> Joint/Trustee Client Signature          Date | (X)_____ <br> Joint /Trustee Client Signature          Date |
| Joint/Trustee's TIN to be used by Oppenheimer is: | Joint/Trustee's TIN to be used by Oppenheimer is: |
| ☐ Social Security Number or ☐ EIN <br> ┌──┬──┬──┬──┬──┬──┬──┬──┬──┐ <br> └──┴──┴──┴──┴──┴──┴──┴──┴──┘ | ☐ Social Security Number or ☐ EIN <br> ┌──┬──┬──┬──┬──┬──┬──┬──┬──┐ <br> └──┴──┴──┴──┴──┴──┴──┴──┴──┘ |
| ☐ Joint  ☐ Trust/Estate | ☐ Joint/  ☐ Trust/Estate |
| (X)_____ <br> Joint/Trustee Client Signature          Date | (X)_____ <br> Joint Client Signature          Date |
| Joint/Trustee's TIN to be used by Oppenheimer is: | Joint Client's TIN to be used by Oppenheimer is: |
| ☐ Social Security Number or ☐ EIN <br> ┌──┬──┬──┬──┬──┬──┬──┬──┬──┐ <br> └──┴──┴──┴──┴──┴──┴──┴──┴──┘ <br> APR 17 2017 | ☐ Social Security Number or ☐ EIN <br> ┌──┬──┬──┬──┬──┬──┬──┬──┬──┐ <br> └──┴──┴──┴──┴──┴──┴──┴──┴──┘ |
| ☐ Joint/  ☐ Trust/Estate | ☐ Joint  ☐ Trust/Estate |

**PLEASE COMPLETE, SIGN, DETACH, AND RETURN TO THE OFFICE SERVICING YOUR ACCOUNT**



**PLEASE NOTE THAT THIS AGREEMENT SHOULD BE USED BY THE FOLLOWING ACCOUNTS:**

- **Individual/Sole Proprietor Accounts**
- **Individual Retirement Accounts**
- **Custodial Accounts (UGMA and UTMA)**
- **Joint/Trustee Accounts**
- **Trust/Estate Accounts**

### HAVE YOU REMEMBERED TO PROVIDE OR COMPLETE THE FOLLOWING:

- **Your Taxpayer Identification Number?**
- **All signatures and Taxpayer Identification Number(s) if you are opening a joint or multiple owner account and completed Paragraph 32?**
- **The correct Taxpayer Identification Numbers(s) if you are opening a custodianship or trusteeship account?**
- **Signature(s) in the appropriate place at the bottom of Page 6 if you are opening a Margin Account?**
- **Your account number on the top of Page 5, if applicable, and Page 6?**
- **Your preference, to the extent applicable, in Paragraph 35 and 36 ("DISCLOSURES TO ISSUERS" and "DISCLOSURES TO AFFILIATED AND NONAFFILIATED THIRD PARTIES" respectively")**

**FOR FURTHER INFORMATION, PLEASE CONTACT YOUR OPPENHEIMER & CO. INC. FINANCIAL ADVISOR, OR THE LOCAL BRANCH OFFICE SERVICING YOUR ACCOUNT.**



## INSTRUCTIONS – REQUEST FOR TAXPAYER IDENTIFICATION NUMBER AND CERTIFICATION

In compliance with federal regulations, Oppenheimer & Co. Inc. is required to obtain your taxpayer identification number. For most individuals, this is your social security number. You should insert your taxpayer identification number ("TIN") within the appropriate space(s) on Page 6 of the FIRM COPY of the Oppenheimer & Co. Inc. Client Agreement.

Note: Check the appropriate box for the federal tax classification of the person whose name is entered on the "Name" line (Individual/Sole Proprietor, Trust/Estate).

**NOTE:** **These instructions pertain primarily to those persons with U.S. TINs. Non-U.S. persons and/or those who are not eligible for U.S. TINs must complete one of the following forms, which will be sent to you:**

| | |
|---|---|
| **W-8BEN:** | Certificate of Foreign Status of Beneficial Owner for U.S. Tax Withholding |
| **W-8ECI:** | Certificate of Foreign Person's Claim for Exemption from Withholding of Income Effectively Connected with the Conduct of a Trade or Business in the U.S. |
| **W-8EXP:** | Certificate of Foreign Government or Other Foreign Organization for U.S. Tax Withholding |
| **W-8IMY:** | Certificate of Foreign Intermediary, Foreign Partnership or Certain U.S. Branches for U.S. Tax Withholding |

## INSTRUCTIONS AND GENERAL INFORMATION

1) **PROVIDING TINs** – ALL PERSONS OR ENTITIES WHO OPEN OR MAINTAIN AN ACCOUNT WITH OPPENHEIMER & CO. INC. MUST PROVIDE THEIR TIN. If you do not have a TIN, you should contact your local Social Security Administration Office immediately, and let us know as soon as possible thereafter when you have received your TIN.

2) **CERTIFICATION** – By executing the Oppenheimer & Co. Inc. Client Agreement, you certify that the TIN you have provided to us is your correct number and that you are not currently subject to back up withholding for any reason.

3) **BACKUP WITHHOLDING** – If you fail to provide us with your TIN, or if the IRS has previously notified you that you are subject to backup withholding, Oppenheimer & Co. Inc. must by law withhold and pay to the IRS 28% of interest, dividends and gross proceeds paid you.

4) **TINs FOR JOINT ACCOUNTS AND CUSTODIAN ACCOUNTS** – In all cases where there is more than one account owner, you should list first and preferably circle the name of the person whose TIN should be associated with the account. If no name is circled when there is more than one name, the number posted to the account will be considered to be that of the first name listed. All joint owners must each provide their TIN. Remember that for custodian (UGMA) accounts you should furnish the TIN for the minor as the TIN for the account. To avoid confusion, circle the minor's name and TIN.

5) **EXEMPTIONS FROM BACKUP WITHHOLDING AND REPORTING** – Our policy requires all account holders to provide us with certified TINs. The Internal Revenue Code grants exemptions from information reporting and backup withholding for certain types of payments received by certain types of account holders, which include but may not necessarily be limited to the following:

- Corporations
- Retirement or Pension/Profit Sharing Plan Accounts (subject to 1099 R and /or 5498 reporting instead)
- U.S. Government or U.S. Government agency or instrumentality
- A state, the District of Columbia, a possession of the U.S. or any subdivision or instrumentality thereof
- An international organization or any agency or instrumentality thereof
- A non -U.S. central bank of issue
- A dealer in securities or commodities required to register in the U.S. or a possession of the U.S.
- A futures commission merchant ("FCM") registered with the C.F.TC.
- A real estate investment trust
- An entity registered at all times during the tax year under the Investment Company Act of 1940
- A common trust fund operated by a bank under Section 584 (a)
- A middleman known in the investment community as a nominee or custodian



## Margin Account Disclosures

Oppenheimer & Co. Inc. (Oppenheimer) is furnishing this document to you in order to provide some basic facts about purchasing securities on margin, and to alert you to the risks involved with trading securities in a margin account. As discussed above, retirement account owners are not permitted to engage in margin trading. Before trading stocks in a margin account, you should carefully review the margin agreement that accompanies this disclosure form. Consult your Financial Advisor regarding any questions or concerns you may have with your margin accounts.

When you purchase securities, you may pay for the securities in full or you may borrow from Oppenheimer part of the purchase price. If you choose to borrow funds from us, you will need to open a margin account. The securities purchased are the firm's collateral for our loan of funds to you. If the securities in your account decline in value, so does the value of the collateral supporting your loan, and as a result the firm can, and sometimes must, take action, such as issue a margin call, and /or sell securities or other assets in any of your accounts held at Oppenheimer, in order to maintain the required equity in the account relative to the value of the account and the amount borrowed.

It is important that you fully understand the risks involved in trading securities on margin. These risks include the following:

**You can lose more funds than you deposit in the margin account.**
A decline in the value of securities that are purchased in your margin account may require you to deposit additional funds into your Oppenheimer account in order to avoid the forced sale of those securities or other securities or assets in your account(s).

**The firm can force the sale of securities or other assets in your account(s).**
If the equity in your margin account falls below the maintenance margin requirements or the firm's higher "house" requirements, the firm can sell, at its sole discretion, securities or other assets in any of your accounts held at the firm to cover the margin deficiency. You also will be responsible for any short fall in the account after such a sale.

**The firm can sell your securities or other assets without contacting you.**
Some investors mistakenly believe that a firm must contact them for a margin call to be valid, and that the firm cannot liquidate securities or other assets in their accounts to meet the call unless the firm has contacted them first. This is not the case. Most .firms will attempt to notify their customers of margin calls, but they are not required to do so. However, even if a firm has contacted a customer and provided a specific date by which the customer can meet a margin call, the firm can still take necessary steps to protect its financial interests, including immediately selling the securities without notice to the customer.

**You are not entitled to choose which securities or other assets in your account(s) are liquidated or sold to meet a margin call.**
Because the securities are collateral for the margin loan, the firm has the right to decide which securities to sell in order to protect its interest.

**The firm can increase "house" maintenance margin requirements at any time and is not required to provide you advance written notice.**
These changes in firm policy often take effect immediately and may result in the issuance of a maintenance margin call. Your failure to satisfy the call may cause Oppenheimer to liquidate securities in your account(s).

**You are not entitled to an extension of time on a margin call.**
While an extension of time to meet margin requirements may be available to customers under certain conditions, a customer does not have the right to an extension of time.

**The firm may lend or hypothecate securities in your margin account(s).If a debit balance exists in your margin account, the firm may, within the limitations imposed by applicable law, pledge, repledge, hypothecate or rehypothecate, securities in your margin account(s). In this event, your ability to exercise certain attendant rights of ownership with respect to such pledged or hypothecated securities, including, without limitation, the exercise of any voting rights, may be limited. Additionally, you will be at risk of losing your qualified dividend status and consequently, any preferential tax rates on dividends.**



# Margin Account Disclosures

We wish to inform you of the terms and conditions under which interest charges will be applied to your account with us.

1. You will be charged interest on any credit extended to or maintained for you by Oppenheimer & Co. Inc. ("Oppenheimer", "we", "our" or "us") for the purpose of purchasing, carrying, or trading in any securities, or otherwise.

2. The annual rate of interest that you will be charged is set forth below and is based on your average debit balance for the period and our base lending rate ("Our Base Lending Rate"). Our Base Lending Rate is the rate quoted daily by Oppenheimer at our main office in New York. In determining Our Base Lending Rate, we consider the brokers' call rates posted by various money center banks that we select (which may vary from time to time), other representative brokers' call rates, such as the "Call money" rate published by the Wall Street Journal and the New York Times, other commercially recognized rates, such as "Prime rates," and the actual rate that we are charged when borrowing money. We use no mathematical formula in determining Our Base Lending Rate, although the rate will never exceed the highest of the rates described above by more than 100 basis points.

| AVERAGE DEBIT BALANCE | AMOUNT ADDED TO OUR BASE LENDING RATE |
|---|---|
| $100,000 and above | ¾% |
| $75,000-$99,999.99 | 1% |
| $50,000-$74,999.99 | 1¼% |
| $25,000-$49,999.99 | 1¾% |
| $10,000-$24,999.99 | 2¼% |
| $0.01-$9,999.99 | 2¾% |

The rate that you will be charged is subject to change without notice in accordance with changes in Our Base Lending Rate or changes in your average debit balance. If the interest rate is increased for any other reason you will be given at least 30 days prior written notice.

3. Debit balances represent money loaned to you by Oppenheimer. When you purchase securities on margin you must pay the amount required by regulations of the Federal Reserve Board and the balance of the purchase price is loaned to you. This loaned portion creates the debit balance upon which interest is charged.

Each additional purchase adds to your debit balance, as do your interest charges and any other charge that maybe be assessed to your account.

4. Any credit or debit balance in the cash account will be combined with the balance in the margin account for the purpose of computing interest. Only one net entry for interest will appear in the margin account. Interest charges will be made on any extension of credit even if it is not directly related to purchases in your margin account. Examples of such extensions of credit would include, but not be limited to, prepayments to you for securities sold and late payments received from you on purchases in your cash account. Interest charged shall be determined by the rate applied to your margin account.

5. Our interest period runs from the 16th day of the prior month to the 15th day of the current month. Interest is calculated on the average net daily debit balance, which includes any credit and debit balances in your cash and margin accounts during the interest period. The interest charge is determined by multiplying the average net daily debit balance by the rate of interest and by a fraction, the numerator of which is the number of days the debit balance existed and the denominator of which is three hundred sixty (360). Your monthly statement will show the average daily balance and the interest rate used to arrive at the amount of interest charged.

Any credit that appears on your statement due to short sales (including short sales against the box) is offset by a debit of like amount because Oppenheimer has to borrow the security in order to deliver to the buying broker. For the purpose of computing interest, the credit generated by any short sales against the box does not reduce your debit balance until the short position is covered.

If the security that you sold short (or sold short against the box) appreciates in market price over the selling price, interest may be charged on the appreciation in value. If the security that you sold short depreciates in market price, the debit balance is correspondingly reduced by the decrease in value. This practice is known as "marking-to-the-market". Daily closing prices are used to determine any appreciation or depreciation of the security sold short.

6. On all securities which Oppenheimer has or at any time may hold or carry for you in any account of yours (either individually or jointly with others), or which may be deposited with Oppenheimer for any purpose, including safekeeping, Oppenheimer as a pledgee has a general lien for the discharge of all your obligations to it, however arising and irrespective of the number of accounts you have with it.

Any securities in any of your accounts are collateral for any debit balance in your accounts with us. A lien is created by these debits to secure the amount of the money owed to Oppenheimer. This means that, in accordance with the terms of the margin and lending provisions of the Client Agreement, securities in your accounts can be sold to reduce or to liquidate entirely any debit balance in your account.

7. Oppenheimer may require you to deposit additional collateral in accordance with the rules and regulations of the Federal Reserve Board, the Financial Industry Regulatory Authority, the American Stock Exchange and any other regulatory agency to whose jurisdiction Oppenheimer is subject, and in addition, may require you to deposit such additional collateral as Oppenheimer, in its sole discretion, determines is needed as security for your obligations to Oppenheimer. If there is a decline in the market value of your securities, Oppenheimer may request that you deposit additional collateral in order to improve the margin in your account or accounts. It is the general policy of Oppenheimer to require margin customers to maintain at least a 35% margin, although a higher margin applies for certain securities (including stocks and corporate bonds trading at or below a specified price as determined from time to time by Oppenheimer, and put or call options), and a lower margin applies for certain other securities (including Government and municipal securities and corporate bonds trading at or above a specified price as determined from time to time by Oppenheimer). Oppenheimer always reserves the right to require additional margin any time it deems this desirable. Margin calls can be satisfied by the deposit of additional securities and/or funds. You are invited to ask your Financial Advisor for more detail about the above.

Oppenheimer & Co. Inc.
85 Broad Street
New York, NY 10004



Casey Cassity
Director
Branch Control Officer

Oppenheimer & Co. Inc.
10880 Wilshire Boulevard
Suite 2400
Los Angeles, CA 90024
Phone    310-446-7171
Fax      310-446-7164
Toll Free 800-421-4314
casey.cassity@opco.com

Transacts Business on all Principal Exchanges

November 9, 2016

Susan Shapiro Cowan
10711 Ashton Avenue
Los Angeles, CA  90024

REDACTED

**RE: Account #** ███7182

Dear Susan Cowan:

On behalf of Oppenheimer & Co. Inc. ("Oppenheimer"), I would like to thank you for your business and for the opportunity to service your investment needs. We consistently strive to meet the specific investment needs and objectives for each of our clients and it is our policy to review client accounts and contact individual clients to confirm their understanding of their account activity.

Based on the review of our records it appears that your account is an actively traded commission based account with a commission to average weighted equity ratio over the past 12 months of 8.73%. Commission based means that your account is charged a fee for each transaction that occurs and that over time the commission cost in an actively traded account such as yours may be greater than the cost of an account with a fee based structure. Accordingly, Oppenheimer would like to ask for you to consider the services of one of the many types of fee based accounts that it offers that may help you better align the expense of your investment style to a more reasonable cost. By having a fee based account you should be able to better project the costs associated with your account. However, it is important to understand that these fee based accounts may not be suited for everyone and that not all Financial Advisors at Oppenheimer may be licensed to offer fee based arrangements. Commissions are only one variable to determine if a fee based account is right for you. A full and thorough understanding of such accounts is required to determine the appropriateness of your action.

I am available to review these account options to help determine if they are appropriate for you. In addition, please keep in mind that not every financial advisor may be able to offer these types of accounts.

If you have any questions related to the level of activity in your account, the nature of the transactions, or the costs associated with this account, please notify me in one of the following manners: in writing in the comment section below and returning it to my attention; in writing by attaching a separate document to this letter and returning it to my attention; or via telephone, please call me at the toll free number shown above.

version 4/2016



Casey Cassity
Director
Branch Control Officer

Oppenheimer & Co. Inc.
10880 Wilshire Boulevard
Suite 2400
Los Angeles, CA 90024
Phone    310-446-7171
Fax      310-446-7164
Toll Free  800-421-4314
casey.cassity@opco.com

Transacts Business on all Principal Exchanges

In the event that I do not hear from you, Oppenheimer will assume that the transactions in your account are consistent with your investment objectives, risk tolerances, and financial situation that you have provided to us and is pursuant to the instructions and/or orders you have given your financial advisor.

I wish to take this opportunity to thank you, as one of our valued clients, for your continued support and confidence in our Firm and in your Financial Advisor, Dennis Ayre.

Sincerely,

Casey Cassity
Branch Control Officer

C:     Dennis Ayre Director

Comments: _____

_____

_____

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

A true and correct copy of the foregoing document entitled (*specify*): _____
_____
_____

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):**  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) _____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL:**
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) __02/07/2024__, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

Leslie Cohen Law
leslie@lesliecohenlaw.com

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 02/07/2024 | Dennis Phillip Ayre | |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                **F 9013-3.1.PROOF.SERVICE**